TRAIN, ADMINISTRATOR, ENVIRONMENTAL
PROTECTION AGENCY, ET AL. *v.* COLORADO
PUBLIC INTEREST RESEARCH GROUP,
INC., ET AL.

No. 74–1270.   Argued December 9, 1975—Decided June 1, 1976

1

MARSHALL, J., delivered the opinion of the Court, in which all Members joined except STEVENS, J., who took no part in the consideration or decision of the case.

*Deputy Solicitor General Randolph* argued the cause for petitioners. With him on the brief were *Solicitor General Bork, Assistant Attorney General Johnson, Harriet S. Shapiro, Raymond N. Zagone, Dirk D. Snel,* and *Robert V. Zener.*

*David C. Mastbaum* argued the cause for respond-

ents.   With him on the brief were *Richard Cotton* and *David E. Engdahl.*\*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

The issue in this case is whether the Environmental Protection Agency (EPA) has the authority under the Federal Water Pollution Control Act (FWPCA), as amended in 1972, 86 Stat. 816, 33 U. S. C. § 1251 *et seq.* (1970 ed., Supp. IV), to regulate the discharge into the

*\*Henry V. Nickel* and *Marx Leva* filed a brief for the Boston Edison Co. et al. as *amici curiae* urging reversal.

*Michael S. Baram, pro se,* filed a brief for Michael S. Baram et al. as *amici curiae* urging affirmance.

A brief of *amici curiae* was filed by *Evelle J. Younger,* Attorney General, *Robert H. O'Brien,* Assistant Attorney General, and *Nicholas C. Yost, C. Foster Knight,* and *Janet I. Motley,* Deputy Attorneys General, for the State of California, joined by the Attorneys General and other officials for their respective States as follows: *John P. Moore,* Attorney General of Colorado, and *David Robbins,* First Assistant Attorney General; *Robert L. Shevin,* Attorney General of Florida, and *Kenneth F. Hoffman,* Assistant Attorney General; *Curt Schneider,* Attorney General of Kansas, and *Thomas Wobker,* Assistant Attorney General; *Francis B. Burch,* Attorney General of Maryland, and *Warren K. Rich,* Assistant Attorney General; *Francis X. Bellotti,* Attorney General of Massachusetts; *Frank J. Kelley,* Attorney General of Michigan, *Robert A. Derengoski,* Solicitor General, and *Stewart H. Freeman,* Assistant Attorney General; *Warren R. Spannaus,* Attorney General of Minnesota, *Peter W. Sipkins,* Solicitor General, and *Eldon G. Kaul,* Assistant Attorney General; *John C. Danforth,* Attorney General of Missouri, and *Robert M. Lindholm,* Assistant Attorney General; *Warren B. Rudman,* Attorney General of New Hampshire, and *Donald Stever,* Assistant Attorney General; *Louis J. Lefkowitz,* Attorney General of New York, and *John Shea III,* Assistant Attorney General; *Michael Alushin,* Attorney General of Pennsylvania; *John L. Hill,* Attorney General of Texas, and *Douglas Caroom,* Assistant Attorney General; and *Slade Gorton,* Attorney General of Washington, and *Charles B. Roe,* Senior Assistant Attorney General.

Nation's waterways of nuclear waste materials subject to regulation by the Atomic Energy Commission (AEC) and its successors under the Atomic Energy Act of 1954 (AEA). 68 Stat. 919, as amended, 42 U. S. C. § 2011 *et seq.* In statutory terms, the question is whether these nuclear materials are "pollutants" within the meaning of the FWPCA.

## I

Respondents are Colorado-based organizations and Colorado residents who claim potential harm from the discharge of radioactive effluents from two nuclear plants—the Fort St. Vrain Nuclear Generating Station and the Rocky Flats nuclear weapons components plant. These facilities are operated in conformity with radioactive effluent standards imposed by the AEC pursuant to the Atomic Energy Act. The dispute in this case arises because the EPA has disclaimed any authority under the FWPCA to set standards of its own to govern the discharge of radioactive materials subject to regulation under the AEA. Respondents, taking issue with the EPA's disclaimer of authority, brought this suit against petitioners, the EPA and its Administrator, under § 505 of the FWPCA, 33 U. S. C. § 1365 (1970 ed., Supp. IV), which authorizes "citizen suits" against the Administrator for failure to perform nondiscretionary duties under the FWPCA. They sought a declaration that the definition of a "pollutant" under the FWPCA encompasses all radioactive materials, including those regulated under the terms of the AEA, and an injunction directing the EPA and its Administrator to regulate the discharge of all such radioactive materials.

On cross-motions for summary judgment, the United States District Court for the District of Colorado held that the AEC had exclusive authority to regulate discharges of radioactive materials covered by the AEA.

373 F. Supp. 991 (1974). The Court of Appeals for the Tenth Circuit reversed, holding that the FWPCA requires the EPA to regulate discharges into the Nation's waters of all radioactive materials, including those covered by the AEA. 507 F. 2d 743 (1974). Because of the importance of the issue involved in this case, we granted certiorari. 421 U. S. 998 (1975). We now reverse.

## II

Since 1946, when the first Atomic Energy Act was passed, 60 Stat. 755, the Federal Government has exercised control over the production and use of atomic energy through the AEC—replaced since the commencement of this litigation by the Nuclear Regulatory Commission (NRC) and the Energy Research and Development Administration (ERDA).[1] Under the AEA, private parties are permitted to engage in the production of atomic energy for industrial or commercial purposes, but only in accordance with licenses issued by the AEC (NRC) in the furtherance of the purposes of the Act. 42 U. S. C. § 2133.

The comprehensive regulatory scheme created by the AEA embraces the production, possession, and use of three types of radioactive materials—source material,[2]

---

[1] Under the Energy Reorganization Act of 1974, 88 Stat. 1233, 42 U. S. C. § 5801 et seq. (1970 ed., Supp. IV), the licensing and related regulatory functions of the AEC were transferred to the NRC; the ERDA assumed responsibility for the operation of Government nuclear research and production facilities. 42 U. S. C. §§ 5841 (f), 5842, 5814 (c) (1970 ed., Supp. IV). We will refer generally to the AEC to cover the NRC and ERDA after their formation, except where the context requires specific designation of the NRC or ERDA.

[2] "The term 'source material' means (1) uranium, thorium, or any other material which is determined by the Commission pursuant to the provisions of section 2091 of this title to be source material;

special nuclear material,[3] and byproduct material.[4]   In carrying out its regulatory duties under the AEA, the AEC is authorized to establish "such standards . . . as [it] may deem necessary or desirable . . . to protect health or to minimize danger to life or property."   42 U. S. C. § 2201 (b).   See also 42 U. S. C. §§ 2073 (b), (e), 2093 (b), 2111, 2133 (a), (d), 2134 (d).   Pursuant to this authority, the AEC (NRC) has established by regulation maximum permissible releases of source, byproduct, and special nuclear materials into the environment by licensees.   10 CFR § 20.106 and App. B, Table II (1976).   The regulations further provide that licensees should, in addition to complying with the established limits, "make every reasonable effort to maintain . . . releases of radioactive materials in effluents . . . as low as is reasonably achievable."   10 CFR § 20.1 (c) (1976).   Similarly, the regulations require that nuclear facilities be designed to keep levels of radioactive material in effluents "as low as is reasonably achievable."   10 CFR § 50.34a (1976).   See also 10 CFR §§ 50.36a, 50.57 (a) (3), (6) (1976).[5]

---

or (2) ores containing one or more of the foregoing materials, in such concentration as the Commission may by regulation determine from time to time."   42 U. S. C. § 2014 (z).

[3] "The term 'special nuclear material' means (1) plutonium, uranium enriched in the isotope 233 or in the isotope 235, and any other material which the Commission, pursuant to the provisions of section 2071 of this title, determines to be special nuclear material, but does not include source material; or (2) any material artificially enriched by any of the foregoing, but does not include source material."   42 U. S. C. § 2014 (aa).

[4] "The term 'byproduct material' means any radioactive material (except special nuclear material) yielded in or made radioactive by exposure to the radiation incident to the process of producing or utilizing special nuclear material."   42 U. S. C. § 2014 (e).

[5] The Fort St. Vrain Nuclear Generating Station is owned and operated by an NRC licensee, and is accordingly bound by the AEC (NRC) regulations.   The Rocky Flats plant is a federal

The FWPCA established a regulatory program to control and abate water pollution, stating as its ultimate objective the elimination of all discharges of "pollutants" into the navigable waters by 1985. In furtherance of this objective, the FWPCA calls for the achievement of effluent limitations that require applications of the "best practicable control technology currently available" by July 1, 1977, and the "best available technology economically achievable" by July 1, 1983. 33 U. S. C. § 1311 (b) (1970 ed., Supp. IV). These effluent limitations are enforced through a permit program. The discharge of "pollutants" into water is unlawful without a permit issued by the Administrator of the EPA or, if a State has developed a program that complies with the FWPCA, by the State.[6] 33 U. S. C. §§ 1311 (a), 1342 (1970 ed., Supp. IV).

The term "pollutant" is defined by the FWPCA to include, *inter alia,* "radioactive materials."[7] But when

---

facility operated for the ERDA by a private contractor to fabricate plutonium into nuclear weapon parts. The ERDA is also responsible for the operation of approximately 24 other facilities that discharge low levels of source, byproduct, and special nuclear materials. All of these facilities are required to conform to the same effluent standards established by the NRC for commercial facilities. Executive Order No. 11752, § 4 (a)(6), 3 CFR, p. 384 (1974).

[6] The permit program of Colorado, where this case originated, was approved by the EPA on April 8, 1975. 40 Fed. Reg. 16713.

[7] "The term 'pollutant' means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water. This term does not mean (A) 'sewage from vessels' within the meaning of section 1322 of this title; or (B) water, gas, or other material which is injected into a well to facilitate production of oil or gas, or water derived in association with oil or gas production and disposed of in a well, if the well used either to facilitate production or for disposal purposes is approved by authority of the State in which the well is

the Administrator of the EPA adopted regulations governing the permit program, 40 CFR, pt. 125 (1975), he specifically excluded source, byproduct, and special nuclear materials—those covered by the AEA—from the program upon his understanding of the relevant legislative history of the FWPCA:

> "The legislative history of the Act reflects that the term 'radioactive materials' as included within the definition of 'pollutant' in section 502 of the Act covers only radioactive materials which are not encompassed in the definition of source, byproduct, or special nuclear materials as defined by the Atomic Energy Act of 1954, as amended, and regulated pursuant to the latter Act. Examples of radioactive materials not covered by the Atomic Energy Act and, therefore, included within the term 'pollutant' are radium and accelerator produced isotopes." 40 CFR § 125.1 (y) (1975) (citations omitted).[8]

It was the Administrator's exclusion of source, byproduct, and special nuclear materials from the permit program, and consequent refusal to regulate them, that

---

located, and if such State determines that such injection or disposal will not result in the degradation of ground or surface water resources." 33 U. S. C. § 1362 (6) (1970 ed., Supp. IV).

[8] Respondents suggest that the EPA's original interpretation of the term "radioactive materials" was to the contrary. They note that the initial public notice on the Fort St. Vrain permit application—published before the EPA regulations interpreting the Act to exclude coverage of AEA-regulated radioactive materials—contemplated the imposition of limitations on the discharge of "liquid radioactive wastes." Since we do not depend upon the EPA interpretation of the Act in reaching our conclusion, it is unnecessary to consider whether any alleged inconsistencies in the EPA's position warrant our treating it with less deference than would otherwise be the case. See, e. g., *Train* v. *Natural Resources Defense Council*, 421 U. S. 60, 87 (1975); *Udall* v. *Tallman*, 380 U. S. 1, 16–18 (1965).

precipitated the instant lawsuit. The question we are presented with, then, is whether source, byproduct, and special nuclear materials are "pollutants" within the meaning of the FWPCA.

### III

The Court of Appeals resolved the question exclusively by reference to the language of the statute. It observed that the FWPCA defines "pollution" as "the man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water." 33 U. S. C. § 1362 (19) (1970 ed., Supp. IV). And it noted that the reference to "radioactive materials" in the definition of "pollutant" was without express qualification or exception, despite the fact that the overall definition of "pollutant" does contain two explicit exceptions.[9] The court concluded from this analysis of the language that by the reference to "radioactive materials" Congress meant *all* radioactive materials. The court explained:

> "In our view, then, the statute is plain and unambiguous and should be given its obvious meaning. Such being the case, . . . we need not here concern ourselves with the legislative history of the 1972 Amendments. In this regard we would note parenthetically that in our view the legislative history of the 1972 Amendments is conflicting and inconclusive. Be that as it may, in the case before us there is no need to address ourselves to the ofttimes difficult task of ascertaining legislative intent through legislative history. Here, the legislative intent is clearly manifested in the language of the statute itself, and we need not resort to legislative history." 507 F. 2d, at 748 (citations omitted).

To the extent that the Court of Appeals excluded

---

[9] See n. 7, *supra.*

reference to the legislative history of the FWPCA in discerning its meaning, the court was in error. As we have noted before: "When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'" *United States* v. *American Trucking Assns.*, 310 U. S. 534, 543–544 (1940) (footnotes omitted). See *Cass* v. *United States*, 417 U. S. 72, 77–79 (1974). See generally Murphy, Old Maxims Never Die: The "Plain-Meaning Rule" and Statutory Interpretation in the "Modern" Federal Courts, 75 Col. L. Rev. 1299 (1975). In this case, as we shall see, the legislative history sheds considerable light on the question before the Court.

Before turning to the various legislative materials, however, we pause to consider an additional argument asserted by respondents on the basis of the language of the statute. Section 1311 (f), they note, provides as follows:

> "Notwithstanding any other provisions of this chapter it shall be unlawful to discharge any radiological, chemical, or biological warfare agent or high-level radioactive waste into the navigable waters." 33 U. S. C. § 1311 (f) (1970 ed., Supp. IV).

Respondents suggest that it would be inconsistent for Congress in one section of the FWPCA to prohibit the discharge of "radiological warfare agents" and "high-level radioactive waste," both of which are subject to AEA regulation, while at the same time exempting AEA-regulated materials from the FWPCA's permit program. We see no inconsistency. That Congress has chosen to ban completely the discharge of certain high-level radioactive material regulated under the AEA does not, by itself, indicate whether Congress wanted the discharge of other radioactive material regulated under the AEA to be

subject to the FWPCA's permit program. Respondents argue further, however, that Congress' use of the phrase "[n]otwithstanding any other provisions of this chapter" before the ban on the discharge of high-level radioactive waste suggests that the discharge of such material would otherwise be subject to the FWPCA's permit program. This argument is not entirely without logical appeal, but we do not consider it determinative. Like the more general argument based on the definition of a "pollutant" as including "radioactive materials," this argument must be assessed against the background of the relevant legislative history.

## IV

The legislative history of the FWPCA speaks with force to the question whether source, byproduct, and special nuclear materials are "pollutants" subject to the Act's permit program. The House Committee Report was quite explicit on the subject:

> "The term 'pollutant' as defined in the bill includes 'radioactive materials.' *These materials are those not encompassed in the definition of source, byproduct, or special nuclear materials as defined by the Atomic Energy Act of 1954, as amended, and regulated pursuant to that Act. 'Radioactive materials' encompassed by this bill are those beyond the jurisdiction of the Atomic Energy Commission.* Examples of radioactive material not covered by the Atomic Energy Act, and, therefore, included within the term 'pollutant,' are radium and accelerator produced isotopes." H. R. Rep. No. 92–911, p. 131 (1972), 1 Leg. Hist. 818 (emphasis added).[10]

---

[10] Citations to "Leg. Hist." refer to a two-volume Committee print for the Senate Committee on Public Works, A Legislative History of the Water Pollution Control Act Amendments of 1972, 93d Cong., 1st Sess. (1973).

The definition of "pollutant" in the House version of the bill, H. R. 11896, 92d Cong., 2d Sess., § 502 (6) (1972), 1 Leg. Hist. 1068, contained the same broad reference to "radioactive materials" as did the definition in the Senate bill, S. 2770, 92d Cong., 1st Sess., § 502 (f) (1971), 2 Leg. Hist. 1697, and the bill ultimately enacted as the FWPCA; for our purposes the definitions are identical. Moreover, the House version of the bill contained the provision now codified as § 1311 (f), banning the discharge of radiological warfare agents and high-level radioactive waste "[n]otwithstanding any other provisions of this Act." H. R. 11896, *supra*, § 301 (e), 1 Leg. Hist. 965. Thus, the House Committee, describing the import of the precise statutory language with which we are concerned, cautioned that the definition of "pollutant" did not include those radioactive materials subject to regulation under the AEA.

Respondents claim to find in the Senate Committee Report an indication that the statutory definition of "pollutant" embraces radioactive materials subject to AEA regulation. Section 306 of the Senate bill, which corresponds to 33 U. S. C. § 1316 (1970 ed., Supp. IV), required that the EPA Administrator establish "standards of performance" with respect to the discharge of pollutants from specified categories of sources, to be revised from time to time by the Administrator. The Senate Committee Report noted that nuclear fuels processing plants were not included, because the EPA did not then have "the technical capability to establish controls for such plants." S. Rep. No. 92–414, p. 59 (1971), 2 Leg. Hist. 1477. The Report then observed that the Committee "expects that EPA will develop the capability," and continued:

"The Bureau of Radiological Health, which was transferred to the Environmental Protection Agency,

should have the capacity to determine those levels of control which can be achieved for nuclear fuels processing plants. If they do not, such a capability should be developed and this particular source should be added to the list of new sources as soon as possible." *Ibid.*

Petitioners assert that this statement by the Committee has no bearing on the question before the Court. The statement, petitioners suggest, reflects no more than a recognition, shared by them, that the plants referred to were not intended to be wholly excluded from the reach of the FWPCA—a recognition that in their view means that the EPA can control the discharge from such plants of polluting materials other than source, byproduct, and special nuclear materials. In short, petitioners contend that the statement sheds no light on the question whether source, byproduct, and special nuclear materials are pollutants under the FWPCA.

We agree with the petitioners that the Senate Committee statement is addressed to the inclusion of nuclear fuels processing plants in the category of sources subject to the EPA's control, not to the inclusion of any particular materials within the definition of "pollutant." It is true that the reference to the development of control levels by the Bureau of Radiological Health [11] does permit the inference that the Committee was contemplating controls over the discharge of AEA-regulated radioactive materials. Still, we are not prepared to attribute greater significance to this inference than to the more explicit statement contained in the House Committee Report; a statement that, as we shall see, is amply

---

[11] The Bureau of Radiological Health was transferred to the EPA from the Department of Health, Education, and Welfare pursuant to § 2 (a) (3) (ii) (C) of Reorganization Plan No. 3 of 1970, which established the EPA. 84 Stat. 2087, 5 U. S. C. App., p. 610.

supported by the discussion on the floors of the House and the Senate.

A colloquy on the Senate floor between Senator Pastore, the Chairman of the Joint Committee on Atomic Energy, and Senator Muskie, the FWPCA's primary author, provides a strong indication that Congress did not intend the FWPCA to alter the AEC's control over the discharge of source, byproduct, and special nuclear materials. Senator Pastore, referring to the need to define what materials are "subject to control requirements" under the FWPCA, noted that the definition of "pollutant" included the words "radioactive materials." 2 Leg. Hist. 1265. The following exchange then took place:

"MR. PASTORE. . . .

"My question is this: Does this measure that has been reported by the committee in any way affect the existing law, that is, the existing Atomic Energy Act of 1954, insofar as the regulatory powers of the AEC are concerned with reference to radioactive material?

"MR. MUSKIE. It does not; and it is not the intent of this act to affect the 1954 legislation.

"MR. PASTORE. In other words, this bill does not change that feature of the Atomic Energy Act in any regard?

"MR. MUSKIE. That is correct.

"MR. PASTORE. I thank the Senator.

"MR. MUSKIE. May I say in addition, that legislation dealing with the setting of effluent limitations as they involve nuclear powerplants is now pending in the courts. The Senator is aware of that litigation.

"For example, a recent decision of the U. S. Court

of Appeals for the Eighth Circuit, in the case of Northern States Power and Light versus Minnesota, raises the issue. I would like to point out that the committee considered speaking specifically to that decision, but chose to remain silent so as not to prejudice the decision or any appeal from it.

"MR. PASTORE. Yes. As a matter of fact, that decision held that the Federal Government did pre-empt in this field under existing law. That is the opinion, and we hope this legislation does not change that opinion in any way, and does not affect existing law. That is all I am concerned with.

"MR. MUSKIE. The Senator is correct in his evaluation of the legislation on that point." *Id.,* at 1265–1266.

Respondents contend that this colloquy "merely reiter-ates that the FWPCA does not alter the regulatory authority of the AEC" over source, byproduct, and spe-cial nuclear materials. Brief for Respondents 40–41. The exchange, they assert, says nothing about the EPA's authority to regulate the same materials. The discussion is consistent, they claim, with their position that the AEC must defer to the EPA in the setting of effluent limitations for AEA-regulated materials—that, for example, NRC licenses must conform to permits issued under the FWPCA. We disagree.

The thrust of Senator Muskie's assurances that the FWPCA would not "in any way affect" the regulatory powers of the AEC was, we think, that the AEC was to retain full authority to regulate the materials covered by the AEA, unaltered by the exercise of regulatory au-thority by any agency under the FWPCA. This conclu-sion is reinforced by Senator Muskie's reference to the case of *Northern States Power Co.* v. *Minnesota,* 447 F. 2d 1143 (CA8 1971). In that case, which was subse-

quently affirmed summarily by this Court, 405 U. S. 1035 (1972), the Eighth Circuit had held that the AEA created a pervasive regulatory scheme, vesting exclusive authority to regulate the discharge of radioactive effluents from nuclear power plants in the AEC, and pre-empting the States from regulating such discharges. The absence of any room for a state role under the AEA in setting limits on radioactive discharges from nuclear power plants [12] stands in sharp contrast to the scheme created by the FWPCA, which envisions the development of state permit programs, 33 U. S. C. §§ 1342 (b), (c) (1970 ed., Supp. IV), and allows the States to adopt effluent limitations more stringent than those required or established under the FWPCA. 33 U. S. C. § 1370 (1970 ed., Supp. IV). See also 33 U. S. C. §§ 1311 (b)(1)(C), 1314 (b), 1316 (c), 1341 (a)(1) (1970 ed., Supp. IV).[13] Senator

---

[12] The AEA, as amended in 1959, 73 Stat. 688, 42 U. S. C. § 2021, does permit the States to assume, pursuant to agreements with the AEC, a limited role in regulating source and byproduct materials, and special nuclear materials in quantities not sufficient to form a critical mass. But state regulatory programs must be compatible wth the AEC's regulatory program, § 2021 (d)(2), and States are precluded from playing any role in several significant areas of regulation—including the setting of limitations on radioactive discharges from nuclear power plants. § 2021 (c)(1); *Northern States Power Co.* v. *Minnesota,* 447 F. 2d 1143, 1149 n. 6 (CA8 1971).

[13] Section 101 (b) of the FWPCA, 33 U. S. C. § 1251 (b) (1970 ed., Supp. IV), provides generally:

"It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter. It is further the policy of the Congress to support and aid research relating to the prevention, reduction, and elimination of pollution and to provide Federal technical services and financial aid to State and interstate

Muskie's specific assurance to Senator Pastore that the FWPCA would not affect existing law as interpreted in *Northern States* can only be viewed, we think, as an indication that the exclusive regulatory scheme created by the AEA for source, byproduct, and special nuclear materials was to remain unaltered.[14]

In the course of the House's consideration of the FWPCA, an unsuccessful attempt was made to alter the AEA's scheme for regulating the discharge of the radioactive materials involved in this case. Representative Wolff proposed to amend what is now 33 U. S. C. § 1370 (1970 ed., Supp. IV), which gives States the authority to set more stringent limits on the discharge of pollutants, by adding a paragraph giving the States the authority to regulate the discharge of radioactive wastes from nuclear power plants. The debate on that amendment and its defeat by a 3-to-1 vote provide solid

---

agencies and municipalities in connection with the prevention, reduction, and elimination of pollution."

[14] Respondents contend that a discussion between Senator Buckley and Senator Muskie on the Senate floor is indicative of an intent to permit the EPA to regulate the discharge of AEA-regulated radioactive materials. Senator Buckley expressed concern about § 511 (c)(2)(B) of the FWPCA, 33 U. S. C. § 1371 (c)(2)(B) (1970 ed., Supp. IV), which precludes agencies other than EPA from "impos-[ing], as a condition precedent to the issuance of any license or permit, any effluent limitation other than any such limitation established pursuant to this chapter." Referring to recent action by the AEC to control thermal pollution of the Hudson River, Senator Buckley asked Senator Muskie whether § 511 (c)(2)(B) would bar AEC decisions "of this type" setting tougher limitations than those prescribed by the EPA. Senator Muskie's response was that the AEC would be required to abide by EPA effluent limitation controls "with respect to the subject matter which the Senator has raised." 1 Leg. Hist. 198. The subject matter raised was thermal pollution, and we do not interpret Senator Muskie's response as suggesting that a similar conclusion would be reached with respect to pollution by AEA-regulated radioactive materials.

18

support for the conclusion that the FWPCA's grant of regulatory authority to the EPA and the States did not encompass the control of AEA-regulated materials.

The Wolff amendment, according to its author, would "give the States a voice in deciding what kinds and amounts of such radioactive wastes may be discharged into their waters." 1 Leg. Hist. 544. In explaining the need for such an amendment, Representative Wolff noted that the time had come "to seriously consider standards more stringent than those promulgated by the AEC." *Id.*, at 545. Representative Frenzel, a co-sponsor of the amendment, pictured it as an attempt to alter the result in the *Northern States* case. The AEC, he explained, could not be expected to protect the health and safety of the public as effectively as the States, because "the AEC has a dual mission—that of promotion as well as safety." 1 Leg. Hist. 548.[15]

The opponents of the Wolff Amendment voiced strong opposition to the transfer of the AEC's regulatory authority to the States *or* to the EPA. Representative Stanton, a Member of the House Committee on Public Works, which reported the House bill, stated:

"The amendment presents the House with a very complex and difficult proposition. It proposes to take authority for the setting of pollution control standards from the AEC and places it in the hands of EPA. For normal operations involving pollution, that control properly belongs under EPA. But atomic energy is a peculiar field. To date, the operation of the atomic energy program has been under the control of the Commission itself. Eventually, such control will be delegated to the States as more and more knowledgeable people at the State level be-

---

[15] See also 1 Leg. Hist. 552 (remarks of Rep. Hungate), 555 (remarks of Rep. McClory).

come involved in the atomic energy program. That time, however, has not yet arrived. Until we reach that stage it is obvious that the control of which we speak should remain with the Atomic Energy Commission itself, as the committee points out on page 131 of House Report 92–911 [quoted *supra*, at 11], which accompanies this bill. For this reason, I would oppose the amendment offered by my distinguished colleague." *Id.*, at 554–555.

Representative Price, Vice Chairman of the Joint Committee on Atomic Energy, argued against the amendment as follows:

"The bill as reported establishes a program of effluent limitations and standards, and section 510 clearly provides that the States may set more restrictive standards should they so desire. The proposed amendment is aimed at two so-called pollutants—radioactive materials and thermal discharges—and seeks to collaterally amend any statute enacted by the Congress relative to them without any specific reference to the statutes that might be affected. As to radioactive materials, the target of the amendment is obvious. It seeks to reverse the decisions of the courts which have held that the Atomic Energy Act of 1954 preempted to the Federal Government, acting through the Atomic Energy Commission, the exclusive jurisdiction to regulate most radioactive materials. Clearly, if such is the will of the House, it should be undertaken only after a thorough examination of the impact of such a decision and it should be done directly by amending the statute involved—the Atomic Energy Act—not collaterally through this legislation. If this amendment had been proposed as a piece of original legislation, it would have been referred to the appropriate

committee for hearings and evaluation of all the pertinent factors involved in such a decision. I could go on with the explanation of those factors, but this is not the time nor the place for such a consideration in the first instance. This bill is not the appropriate vehicle for amending a major piece of legislation, thoroughly considered in committee and by the Congress, which established at the direction of the Congress a thorough and pervasive regulatory program relative to radioactive materials." *Id.*, at 556.

Representative McCormack, a Member of the House Committee on Public Works and Chairman of the House Science and Astronautics Committee's Task Force on Energy Research and Development, urged the amendment's defeat in similar terms. After noting the inadvisability of "throwing away" the AEC's "meticulous work" in the area of safety in favor of state regulation, *id.*, at 550, he concluded:

"[I]t is obvious from the report by the House Committee on Public Works for this bill, and from the committee report from the other body that this bill does not impact directly upon the Atomic Energy Act of 1954. This bill applies only to radioactive materials not covered by the Atomic Energy Act of 1954 and, as such, the amendment is not relevant to this bill at all." *Id.*, at 551.[16]

Respondents urge that the Wolff amendment was addressed only to the question of the States' regulatory authority, and that its defeat did not reflect any intent to foreclose regulation of source, byproduct, and special nuclear materials by the EPA. We do not agree that

---

[16] See also *id.*, at 546–547 (remarks of Rep. Holifield); 553 (remarks of Rep. Hosmer); 553 (remarks of Rep. Clausen); 557 (remarks of Rep. Harsha).

the House's consideration of the Wolff amendment leaves room for EPA regulation. Several of the opponents of the amendment were quite explicit in their reliance upon the House Committee Report's statement that radioactive materials subject to AEA regulation were excluded from the coverage of the FWPCA.[17] Neither Representative Wolff nor Representative Frenzel took issue with that interpretation in the course of the debate on their amendment,[18] and indeed it is arguable that their amendment was premised on the assumption that source, byproduct, and special nuclear materials were wholly beyond the scope of the FWPCA. If these materials were covered by the Act—that is, if they were "pollutants"—the amendment was wholly superfluous, for the *unamended* provision that is now 33 U. S. C. § 1370 (1970 ed., Supp. IV) would permit the States to regulate their discharge. But regardless of the underlying assumptions of the sponsors of the Wolff amend-

[17] In addition to the comments of Representatives Stanton and McCormack, quoted above, see *id.*, at 587–588 (remarks of Reps. Holifield, Jones, Harsha, and Hosmer).

[18] The statements of Representatives Wolff and Frenzel referred to above suggest that they recognized the absence of any role for the EPA in regulating the materials in question. In explaining the need to vest regulatory power in the States, they both referred to the inadequacy of regulation by the AEC, without any mention of the prospect of regulation by the EPA.

It should not escape mention that one supporter of the Wolff amendment, Representative McClory, urged its adoption "in order to make eminently clear that we are controlling nuclear . . . pollution in this bill." *Id.*, at 555. To the extent that this statement suggested that the amendment merely clarified what the House bill already provided, it is a far less persuasive indicator of legislative intent than the contrary statements by the successful opponents of the amendment. Similarly, Representative Frenzel's statement the day after the Wolff amendment was defeated that the FWPCA applied to AEA-regulated radioactive materials, 1 Leg. Hist. 745–746, is not entitled to great weight.

ment, the interpretation respondents would place upon its defeat is unacceptable. As respondents would have it, the House expressed an intent to permit EPA regulation of the materials in question, but to preclude state regulation of the same materials under the FWPCA. That result could find no basis in the language of the Act. In our view, then, the House's consideration and rejection of the Wolff amendment offers additional support for the interpretation stated in the House Committee Report that source, byproduct, and special nuclear materials are beyond the reach of the FWPCA.

The House's rather explicit statement of intent to exclude AEA-regulated materials from the FWPCA was unchallenged by the Conference Committee, which simply retained the same reference to "radioactive materials" contained in both the House and Senate bills. S. Conf. Rep. No. 92–1236, p. 144 (1972), 1 Leg. Hist. 327. Representative Harsha, a ranking member of the Conference Committee, explained the import of the Conference Committee action as follows:

> "The conference report does not change the original intent as it was made clear in the colloquy between Senators Muskie and Pastore in the course of the debate in the other body. I also note that an amendment to H. R. 11896 was offered on March 28, 1972, which would have overturned the Northern States Power against Minnesota case.
>
> "The distinguished gentleman from California (Mr. Holifield) spoke in opposition to the amendment and pointed out the necessity of not changing the careful division of authority between the States and the Federal Government over nuclear materials and facilities as enunciated in the Northern States case. The amendment was defeated by a 3-to-1 vote of the House.

"I can say to the gentleman from Illinois that the managers in no way detracted from the intent of the language in H. R. 11896. I also note that the Committee on Public Works in its report on H. R. 11896 stated on page 131 that the term 'pollutant' as defined in the bill includes 'radioactive materials.' These materials are not those encompassed in the definition of source, byproduct, or special nuclear materials as defined by the Atomic Energy Act of 1954, as amended, and regulated pursuant to that act. 'Radioactive materials' encompassed by this bill are those beyond the jurisdiction of the Atomic Energy Commission. Examples of radioactive materials not covered by the Atomic Energy Act, and, therefore, included within the term 'pollutant' are radium and accelerator produced isotopes. This language adequately reflects the intent of the managers of the conference report." *Id.,* at 226–227.

See also *id.,* at 229 (remarks of Rep. Jones). With no one expressing a different view of the Conference action, the House proceeded to agree to the Conference Report. *Id.,* at 276.[19]

## V

If it was not clear at the outset, we think it abundantly clear after a review of the legislative materials that reliance on the "plain meaning" of the words "radioactive materials" contained in the definition of "pollutant" in the FWPCA contributes little to our understanding of

---

[19] We also note that in the course of its consideration of the Energy Reorganization Act of 1974, 88 Stat. 1233, which created the NRC and ERDA, the House rejected an amendment that would have transferred from those agencies to the EPA the authority to set emission standards for source, byproduct, and special nuclear materials. 119 Cong. Rec. 42615–42616 (1973).

whether Congress intended the Act to encompass the regulation of source, byproduct, and special nuclear materials. To have included these materials under the FWPCA would have marked a significant alteration of the pervasive regulatory scheme embodied in the AEA. Far from containing the clear indication of legislative intent that we might expect before recognizing such a change in policy, cf. *United States* v. *United Continental Tuna Corp.*, 425 U. S. 164, 168–169 (1976), the legislative history reflects, on balance, an intention to preserve the pre-existing regulatory plan.[20]

---

[20] It does not follow, however, that the EPA has no role to play in protecting the environment from excessive radiation attributable to AEA-regulated materials. The EPA was established by Reorganization Plan No. 3 of 1970, 84 Stat. 2086, 5 U. S. C. App., p. 609. Among the functions transferred to the EPA under the plan were:

"The functions of the Atomic Energy Commission under the Atomic Energy Act of 1954, as amended, . . . [that] consist of establishing generally applicable environmental standards for the protection of the general environment from radioactive material. As used herein, standards mean limits on radiation exposures or levels, or concentrations or quantities of radioactive material, in the general environment outside the boundaries of locations under the control of persons possessing or using radioactive material." § 2 (a) (6), 84 Stat. 2088, 5 U. S. C. App., p. 610.

In his message accompanying the reorganization plan, President Nixon emphasized that the AEC was to "retain responsibility for the implementation and enforcement of radiation standards through its licensing authority." 5 U. S. C. App., p. 612. Petitioners' brief, expressing the views of the EPA, NRC, and ERDA, explains the resultant division of authority as follows:

"EPA was to set generally applicable radiation standards, limiting the total amount of permissible radiation in the environment from major categories of sources, while the AEC was to prescribe the limitations applicable to discharges of licensed materials from particular sources which contribute to the total." Brief for Petitioners 52–53 (citations omitted).

See AEC–EPA Memoranda of Understanding, 38 Fed. Reg. 24936,

We conclude, therefore, that the "pollutants" subject to regulation under the FWPCA do not include source, byproduct, and special nuclear materials, and that the EPA Administrator has acted in accordance with his statutory mandate in declining to regulate the discharge of such materials. The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

---

32965 (1973). See also Environmental Protection Agency, Proposed Standards for Environmental Radiation Protection for Nuclear Power Operations, 40 Fed. Reg. 23419 (1975).