**Rick W. JORDAN and Suzanne Jordan, Plaintiffs,**

v.

**AMERADA HESS CORPORATION et al., Defendants.**

**Lydia HEPPNER, as Personal Representative of the Estate of Henry J. Heppner, Jr., Deceased, Plaintiff,**

v.

**AMERADA HESS CORPORATION et al., Defendants.**

Civ. Nos. F78–19, F78–23.

United States District Court, D. Alaska.

Nov. 15, 1979.

**574**

James A. Parrish and Roger Brunner, Fairbanks, Alaska, for plaintiffs.

Robert L. Eastaugh, Anchorage, Alaska, Girard E. Boudreau, Jr., O'Melveny & Myers, Los Angeles, Cal., for defendants.

## MEMORANDUM AND ORDER

VON DER HEYDT, Chief Judge.

THESE CAUSES come before the court on defendants' motion for judgment on the pleadings for failure to state a claim upon which relief can be granted. Two cases have been consolidated for the purpose of this motion in order to determine the scope of the strict liability provision of the Trans-Alaska Pipeline Authorization Act, 43 U.S.C. § 1653(a)(1).

The *Jordan* case (F78–19) arises from personal injuries allegedly sustained in an automobile accident that occurred in the vicinity of the Alaska pipeline. The *Heppner* case is a wrongful death action arising as the result of a construction accident in the Alaska pipeline right-of-way. In both cases the plaintiffs allege that the injuries and death and the damages arising therefrom were in connection with or resulting from activities along or in the vicinity of the Trans-Alaska pipeline right-of-way and that the defendants are liable under the strict liability provisions of the pipeline authorization act.

43 U.S.C. § 1653(a)(1) states:

Except when the holder of the pipeline right-of-way granted pursuant to this chapter can prove that damages in connection with or resulting from activities along or in the vicinity of the proposed trans-Alaskan pipeline right-of-way were caused by an act of war or negligence of the United States, other government entity, or the damaged party, such holder shall be strictly liable to all damaged parties, public or private, without regard to fault for such damages, and without regard to ownership of any affected lands, structures, fish, wildlife, or biotic or other natural resources relied upon by Alaska Natives, Native organizations, or others for subsistence or economic pur-

poses. Claims for such injury or damages may be determined by arbitration or judicial proceedings.

The word "damages" is only qualified by the phrase "in connection with or resulting from activities along or in the vicinity of the proposed trans-Alaskan pipeline right-of-way."

■ The defendant oil companies contend that "the strict liability provisions here at issue were affirmatively and specifically designed to deal with a single clearly delineated and acknowledged problem of national concern—the unique environmental risks inherent in the construction and operation of the pipeline." Defendants' Brief in Support at 74. The defendants further contend that the legislative history of this provision makes it clear such does not apply to the automobile accident and the construction accident involved in these cases. The plaintiffs rely upon the language of the statute which is not limited by its own terms to damage to land, wildlife, and other environmental and subsistence values. They contend that this court should not rely upon the legislative history to limit the plain words of the statute. The first question the court must determine is the extent to which the court should consider the legislative history in limiting the open ended language of section 1653(a)(1).

The U.S. Supreme Court has stated that:

[F]requently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act.

*Church of the Holy Trinity v. United States*, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892). *Accord: United States v. American Trucking Assns.*, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); *Armstrong Co. v. Nu Enamel Corp.*, 305 U.S. 315, 333, 59 S.Ct. 191, 83 L.Ed. 195 (1938); *Sorrels v. United States*, 287 U.S.

435, 446–448, 53 S.Ct. 210, 77 L.Ed. 413 (1932); *United States v. Ryan*, 284 U.S. 167, 175, 52 S.Ct. 65, 76 L.Ed. 224 (1931); *Kenai Peninsula Borough v. Andrus*, 436 F.Supp. 288, 291 (D.Alaska 1977). *But see TVA v. Hill*, 437 U.S. 153, 187 n. 33, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). The Court's recent decision in *TVA v. Hill* casts some doubt on the issue of consultation of legislative history to avoid "absurd" results when the plain language of the statute covers the fact situation before the court. In that case the Court took a very literalist view of the Endangered Species Act of 1973 and held that construction of the Tellico Dam, which was 80% completed, must be halted to protect the snail darter, an endangered species. Justice Powell, relying upon the *Church of the Holy Trinity* case, wrote a dissent which contended that the result sanctioned by the Court, halting a nearly completed dam, was an absurd result which justified the Court's deviation from the literal words of the statute. 437 U.S. at 202–206, 98 S.Ct. 2279 (dissenting). This court has examined *Hill* and finds that it does not prevent examination of the legislative history of the Trans-Alaska Pipeline Authorization Act to determine whether the oil companies are strictly liable for all damages of any kind that occur "in connection with" or "in the vicinity of the proposed trans-Alaska pipeline right-of-way." As Justice Powell explained, "The real difference between the Court and myself on this issue arises from our perceptions of the character of today's result. The Court professes to find nothing particularly remarkable about the result produced by its decision in this case." 437 U.S. 204 n. 14, 98 S.Ct. 2307 n.14 (dissenting). This court finds the result urged by the plaintiffs in this case to be quite absurd and preposterous and finds that their contention must be supported by *some* legislative history before it reasonably could be sustained. In addition, the Court in *TVA v. Hill* did not cease its inquiry with the plain language of the statute but went on to examine the legislative history. In that case the Court found support in the legislative history for its view of the language.

In this case there is no legislative history that would indicate that the Congress intended to include damage caused by automobile or construction accidents within the strict liability provisions of the Trans-Alaska Pipeline Authorization Act. An examination of the legislative history shows that these provisions were designed to establish the permit holders of the pipeline right-of-way as strictly liable for a broad range of damages to the land, fish, wildlife, air, water, and the subsistence lifestyle of the Alaskan Native.

The problem the provision was designed to remedy was raised by many witnesses at the committee hearings. For example, William Hensley, President of the Alaska Federation of Natives, told the Senate Committee:

> The danger we fear from the pipeline proposal that would not provide an indemnification to the Natives is that there could be interference with those migration patterns [of caribou], with the spawning of the salmon or other fish in the various streams, that would not be within the areas of land selection rights granted to the native people, but would represent a severe detrimental depletion of their way of life—the very food they live by.
>
> Unless there is provision for indemnification, the burden of that risk will fall on the Alaska Natives and not on the pipeline customers who would be paying for the cost of doing business.

Testimony of William Hensley, President, Alaska Federation of Natives, Senate Hearings, Part I at 224.

Fishermen were also concerned about the environmental impact of the pipeline. A representative of the Cordova District Fisheries Union told the Senate Committee:

> We feel that the liability of the operators of the pipeline . . . should be clarified so as to read that the fishermen who depend on Prince William Sound for their fisheries are indemnified against

loss to their fisheries resulting from the transfer of oil from the pipeline to the tanker and any resulting casualties or chronic pollution such as pumping ballast water out into the sound.

Testimony of Saunders C. Hillyer, Senate Hearings, Part I at 279. Mr. Hillyer's written statement made specific suggestions for the provision found in 43 U.S.C. § 1653.

> We therefore urge the Congress to impose on the owners and operators of the trans-Alaskan pipeline and marine transport system absolute liability to commercial fishermen for damage to the value of their fisheries and fishing gear that results from pipeline operation and the marine transport of North Slope oil.

Statement of Saunders C. Hillyer, Senate Hearings, Part IV, Appendix at 359.

When the bill reached the floor of the Senate, Senator Jackson, Chairman of the Senate Interior and Insular Affairs Committee, emphasized the environmental purposes behind the provision.[1]

> Without such a stipulation, Alaska Natives, who have a unique dependence upon the subsistence resources of the area that would be traversed by any pipeline to transport North Slope oil or gas will have no means of recovering damages *in the event of destruction or injury to such subsistence resources or their means of livelihood* by reason of such a pipeline. *The Senate Interior and Insular Affairs Committee regards a requirement that the permittee be liable to Alaska Natives for such damage without regard to any questions of negligence as essential.*

119 Cong.Rec. 23859 (daily ed. July 13, 1973, at S–13424) (emphasis added)

In the House, Representative Dingell stated that, "The Committee has sought to impose absolute liability for *oil spills and environmental damage resulting from the pipeline.*" 119 Cong.Rec. 27717 (daily ed. August 2, 1973, at H–7306). (emphasis add-

1. Senator Jackson was commenting on Senate provisions which were modified and adopted by the Conference Committee.

ed). Congressman Dellenback [2] explained the need for the strict liability provisions.

> We have received assurances from Alyeska and the other commercial interests involved in the pipeline that they are convinced the trans-Alaska route can be so constructed as to be environmentally safe. The strict liability clauses in section 207 put the burden on them to prove that their assurances are completely valid. With these clauses, enlightened self-interest will make certain they do the best possible job to prevent environmental damage. Obviously I hope the clauses will never have to be invoked; yet even if they never are, I think their inclusion in H.R. 9130 strengthens the bill to a significant degree.

119 Cong.Rec. 27644 (daily ed. August 2, 1973, at H–7235). As the defendants have correctly pointed out, these provisions could not have been intended to apply to automobile accidents or industrial accidents if their authors had a realistic hope that they would never be invoked.

After the Conference Committee adopted the language found in 43 U.S.C. § 1653, Senator Stevens told the Senate:

> Mr. President, I am certain that my colleagues who have studied the conference report have discovered that the construction, operation and maintenance of the Trans-Alaska pipeline will be subject to a series of responsible standards *intended to protect the environment, create liability where necessary*, and protect the public interest. The specific requirements of the law will be further developed by stipulations and regulations, and the final result will be a series of specific and essential Federal guidelines for this project to insure that it will be completed as safely and efficiently as possible.

119 Cong.Rec. 36813 (daily ed. November 13, 1973, at S–20311) (emphasis added). Representative Udall, a member of the Conference Committee, reported to the House that:

Section 204 of the report provides that the Alaskan pipeline permit holder shall be strictly liable without regard to fault for all damages that result from a pipeline related incident along the right-of-way. This includes damages to Alaskan Natives for any losses they might sustain by disruptions in their subsistence economy that are caused by the pipeline. *It will apply, for example, if the pipeline disturbs a caribou migration or if an oil spill in a river ruins a salmon run. . .*

119 Cong.Rec. 36606 (daily ed. November 12, 1973 at H–9810) (emphasis added).

These lengthy excerpts from the legislative history of 43 U.S.C. § 1653 illustrate the focus of the Congress on environmental harm and damage to the subsistence resources of Alaskans. The plaintiffs have referred to no statements and the court has found none that would support the startling proposition that the oil companies are strictly liable for auto accidents and industrial accidents in the "vicinity" of the pipeline corridor. 43 U.S.C. § 1653 was intended to render the permit holders strictly liable for environmental harm and not the damages alleged in these complaints.

Accordingly IT IS ORDERED:

1. THAT defendants' consolidated motion for judgment on the pleadings is granted.

2. THAT the Clerk may prepare a final judgment form in cause F78–19 stating the complaint is dismissed for failure to state a claim upon which relief can be granted.

3. THAT the Clerk may prepare a final judgment form in cause F78–23 stating that the complaint is dismissed for failure to state a claim upon which relief can be granted.

---

2. Congressman Dellenback was the author of House liability provisions which were modified and adopted by the Conference Committee.