Lydia HEPPNER, as Personal Representative of the Estate of Henry J. Heppner, Jr., Deceased, Plaintiff-Appellant,

v.

ALYESKA PIPELINE SERVICE COMPANY, Amerada Hess Corporation, Arco Pipeline Company, British Petroleum Pipelines, Inc., Exxon Pipeline Company, Mobil Alaska Pipeline Company, Phillips Petroleum Company, Sohio Pipeline Company, and Union Alaska Pipeline Company, Defendants-Appellees.

Rick W. JORDAN and Suzanne Jordan, Plaintiffs-Appellants,

v.

AMERADA HESS CORPORATION, Arco Pipeline Company, British Petroleum Pipelines, Inc., Exxon Pipeline Company, Mobil Alaska Pipeline Company, Phillips Petroleum Company, Sohio Pipeline Company, and Union Alaska Pipeline Company, Defendants-Appellees.

Nos. 79–4883, 79–4884.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 9, 1981.

Decided Nov. 16, 1981.*

* Lodged with clerk's office October 30, 1981.

Roger Brunner, Fairbanks, Alaska, for plaintiffs-appellants.

Girard E. Boudreau, Jr., Los Angeles, Cal., for defendants-appellees.

Before WALLACE and TANG, Circuit Judges, and FRYE,** District Judge.

WALLACE, Circuit Judge:

In this consolidated appeal, Heppner and Jordan challenge the dismissal by the district court of their causes of action brought pursuant to the special liability provisions of the Trans-Alaska Pipeline Authorization Act (the Act), 43 U.S.C. § 1653(a)(1). The district judge concluded that the Act does not provide for personal injury actions unrelated to the special environmental risks created by the pipeline. 479 F.Supp. 573. We agree and affirm.

I

On August 10, 1976, Heppner's husband was working in a gravel pit that served as a material site for the pipeline and was within the pipeline right-of-way. He was crushed between a rock and a piece of heavy equipment, suffering injuries resulting in his death. On July 28, 1976, Jordan was a passenger in an automobile that was involved in an accident in which Jordan suffered personal injuries, and as a result of which his wife suffered a loss of consortium. Jordan alleges that the operation of the vehicle and his being a passenger in it were the result of and in connection with activities along or in the vicinity of the pipeline right-of-way.

II

The only issue on appeal is whether the language of the strict liability provision of the Act covers Heppner's and Jordan's causes of action. The Act provides in part as follows:

** Honorable Helen J. Frye, United States District Judge, District of Oregon, sitting by designation.

Except when the holder of the pipeline right-of-way granted pursuant to this chapter can prove that damages in connection with or resulting from activities along or in the vicinity of the proposed trans-Alaskan pipeline right-of-way were caused by an act of war or negligence of the United States, other government entity, or the damaged party, such holder shall be strictly liable to all damaged parties, public or private, without regard to fault for such damages, and without regard to ownership of any affected lands, structures, fish, wildlife, or biotic or other natural resources relied upon by Alaska Natives, Native organizations, or others for subsistence or economic purposes.

43 U.S.C. § 1653(a)(1).

The question is, therefore, whether ordinary personal injury and wrongful death claims, unconnected with any environmental injury, are embraced by the language "damages in connection with or resulting from activities along or in the vicinity of the proposed trans-Alaskan pipeline right-of-way ...." Jordan and Heppner contend that the language of the statute unambiguously comprehends personal injury and wrongful death actions. They argue that the "plain meaning rule" makes consideration of the legislative history of the Act unnecessary or even improper.

■ There is language in old cases suggesting that the plain meaning rule is, in the proper case, a bar to the consideration of the legislative history. See, e. g., United States v. Missouri Pacific Railroad, 278 U.S. 269, 278, 49 S.Ct. 133, 136, 73 L.Ed. 322 (1929); Caminetti v. United States, 242 U.S. 470, 490, 37 S.Ct. 192, 196, 61 L.Ed. 442 (1917); Pennsylvania Railroad v. International Coal Mining Co., 230 U.S. 184, 199, 33 S.Ct. 893, 896, 57 L.Ed. 1446 (1913). Our reading of more recent Supreme Court cases leads us to conclude that the plain meaning rule is no longer considered an absolute prohibition, but a flexible principle for ascertaining the intent of Congress. The Court has recently given clear expression to this understanding of the rule:

[A]scertainment of the meaning apparent on the face of the single statute need not end the inquiry. . . . This is because the plain meaning rule is "rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists." Boston Sand Co. v. United States, 278 U.S. 41, 48 [49 S.Ct. 52, 54, 73 L.Ed. 170] (1928) (Holmes, J.).[9] The circumstances of the enactment of particular legislation may persuade a court that Congress did not intend words of common meaning to have their literal effect.

Watt v. Alaska, 451 U.S. 259, 266, 101 S.Ct. 1673, 1677–78, 68 L.Ed.2d 80 (1981). Footnote 9 reads as follows:

"Of course it is true that the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing: be it a statute, a contract, or anything else. But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." Cabell v. Markham, 148 F.2d 737, 739 (C.A.2) (L. Hand, J.), aff'd, 326 U.S. 404 [66 S.Ct. 193, 90 L.Ed. 165] (1945).

Id. at 1677 n.9. See also Train v. Colorado Public Interest Research Group, 426 U.S. 1, 9–10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976); Murphy, Old Maxims Never Die: The "Plain-Meaning Rule" and Statutory Interpretation in the "Modern" Federal Courts, 75 Colum.L.Rev. 1299 (1975).

Heppner and Jordan argue strenuously that TVA v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), supports their position on the role of legislative history in statutory interpretation. That case, however, contains no absolute bar to the use of legislative history. The Court in TVA v. Hill formulated a version of the plain meaning rule as follows:

When confronted with a statute which is plain and unambiguous on its face, we

ordinarily do not look to legislative history as a guide to its meaning. . . . Here it is not *necessary* to look beyond the words of the statute. We have undertaken such an analysis only to meet Mr. Justice Powell's suggestion that the "absurd" result reached in this case . . . is not in accord with congressional intent.

*Id.* at 184 n.29, 98 S.Ct. at 2296 n.29 (emphasis in original) (citation omitted).

This formulation does not foreclose a court from looking to legislative history. It does not require a court to operate under an artificially induced sense of amnesia about the purpose of legislation, or to turn a blind eye towards significant evidence of Congressional intent in the legislative history. *TVA v. Hill* stands for the proposition that evidence of the intent of Congress drawn from the facially clear meaning of the statute will sometimes be so strong that the court will be under no obligation to engage in an exploration of the legislative history; that is, it "is not *necessary* to look beyond the words of the statute." This is no talismanic invocation of an exclusively privileged status for apparently unambiguous statutory language. Rather, it is a recognition of the practical principle that evidence is sometimes so good in the first place to which one turns that it is unnecessary to look further.

■ Thus understood, *TVA v. Hill* is in no conflict with *Watt v. Alaska* or *Train v. Colorado Public Interest Research Group.* When the meaning of statutory language is unclear, one must look to the legislative history. When the statutory language is clear, and there is no reason to believe that it conflicts with the congressional purpose, then legislative history need not be delved into, unless it is brought to the court's attention that there is within the legislative history something so probative of the intent of Congress as to require a reevaluation of the meaning of the statutory language.[1]

*Church of Scientology v. United States Department of Justice,* 612 F.2d 417, 421 (9th Cir. 1979), and *United States v. Rone,* 598 F.2d 564, 569 (9th Cir. 1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980), were decided prior to *Watt v. Alaska* and should be interpreted to be consistent with *Watt.* Thus, they should

---

1. This latter exception for consideration of legislative history in the interpretation of a facially clear statute was part of the holding of *Train v. Colorado Public Interest Group,* 426 U.S. 1, 9 · 11, 96 S.Ct. 1938, 1942–1943, 48 L.Ed.2d 434 (1976). In that case the definition in the Federal Water Pollution Control Act (FWPCA) of "pollutant" on its face embraced all radioactive materials. Moreover, the associated definitional list of the statute included "radioactive materials." The Supreme Court did not fault the conclusion of the court of appeals that "the statute is plain and unambiguous." However, the Court reversed the court of appeals for failing to take into consideration explicit language in the House Committee report on the FWPCA Amendments of 1972 that the categories of radioactive materials regulated by the Atomic Energy Commission and its successors pursuant to the Atomic Energy Act of 1954, were not within the scope of "pollution" under the FWPCA. *Train* thus establishes that if brought to the attention of the court, legislative history that is sufficiently authoritative and explicit can never safely be ignored by a court seeking the meaning Congress intended be carried by statutory language.

We do not suggest that everything counting as legislative history is equally authoritative nor that it necessarily meets the *Train* require-

ment that it aid construction. There is even the possibility that some legislative history is manufactured for the purpose of misleading the courts as to what most members of Congress intended to enact. The court cannot substitute a mechanical use of legislative history for a mechanical use of statutory language. Rather courts should approach legislative materials critically, keeping in mind that the intent of Congress is sought, and that various legislative materials are only better, or worse, evidence of that intent.

*Train* does not, of course, entail that the clear language of a penal statute could be overcome by legislative history to the disadvantage of a criminal defendant. That would conflict with the "fair warning" requirement expressed in the vagueness doctrine of the criminal law. *See Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972); *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). We need not consider whether there may be some cases in which a civil analogue of the "fair warning" doctrine would militate against departure from clear statutory language in reasonable reliance on which members of the public had conformed their conduct. This is not such a case.

not be read to suggest that in some civil cases the court is to apply a rigid rule that legislative history may never be considered, as such would be inconsistent with *Watt v. Alaska.*

Having concluded that we are not forbidden from considering legislative history, our next inquiry is whether we should do so. We first look to the face of the particular part of the statute in question. Although the language of section 1653 is facially clear and unambiguous, the plain meaning rule, as currently articulated by the Supreme Court, requires us to approach the statute, not with mechanical literalism, but with the purpose of implementing Congressional intent. Sometimes the literal application of the statute occasions an unexpected or, in the traditional language, an "absurd" result. The Supreme Court has, at times, considered absurd results of statutory language to be a reason for looking beyond the face of the subject to the legislative history. *United States v. American Trucking Ass'n,* 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940); *Church of Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892). On the other hand, the Court has sometimes determined that absurd or curious results do not require examination of legislative history. *TVA v. Hill,* 437 U.S. at 172–73, 184 n.29, 98 S.Ct. at 2290–91, 2296 n.29 (majority opinion); *id.* at 196, 98 S.Ct. at 2302 (Powell, J., dissenting).

■ It appears to us, on the basis of these cases, that the literal application of statutes may cause two different types of absurd results. In order to implement congressional intent, we must distinguish between them. The first type occurs when a congressional decision produces an unexpected absurd result. It arises out of a failure to trace through the effects of the legislation in cases in which the statute was intended by Congress to apply. If there was a congressional mistake in the Endangered Species Act, the statute in question in *TVA v. Hill,* it was a mistake of this sort. Such mistakes, because they are substantive matters of policy, are for the Congress, not the courts, to correct. In this sense, and short of constitutional error, Congress has a right to be wrong.

The second type of absurdity results from a drafting error. It occurs, for example, when Congress uses more sweeping language than it would if it were attending carefully to fact situations, outside the scope of its purpose, to which the language might be erroneously understood to apply. This second type of mistake is one that a court may correct by interpretation—if the court is in a position to infer the actual intent of Congress.

The first type of absurdity, then, arises within what Congress actually intended, and must normally be let stand. The second type of absurdity results from a misapprehension of the intent of Congress and is usually subject to judicial cure. The first, as in *TVA v. Hill,* does not normally require an investigation of legislative history. The second type, for which the present case is a candidate, often will require an investigation, in order to substantiate the hypothesis that the absurd result is outside the intent of Congress.

We can often distinguish between the two kinds of absurdities by reference to the contexts in which the statutes occur. Frequently, reference to a statute's context will give us some idea of the legislative intent behind the statute. For example, the statute in question in *TVA v. Hill* was part of the Endangered Species Act. Reference to the act as a whole, the context for the statute at issue, indicated that the statute was passed as part of Congress's effort to protect endangered species. The completion of the Teleco Dam, literally proscribed by the statute, genuinely threatened an endangered species. Although application of the literal language of the statute may have lead to an "absurd" result, that result was harmonious with Congressional intent as reflected by the statute's context. In such an instance, we should let stand the literal facial meaning of the statute even though some may conclude that Congress has acted in an "absurd" way—Congress has a right to do so.

In the present case, the statute at issue is the Trans-Alaska Pipeline Authorization Act. Reading that act as a whole, it seems clear that Congress intended to facilitate the development and delivery of oil and gas and, at the same time, to protect the environment. Nothing in the statute's context indicates that Congress meant to expand federal protections for the victims of common personal injury torts.

Furthermore, even when we focus only upon section 1653, we cannot read it without having doubts as to just how wide a net is cast by its strict liability provision. Common sense strongly suggests that the statute does not establish strict liability for every sort of injury that might occur within the pipeline right-of-way. If, as seems logical, a slander shouted or an injury from a fight occurring within the right-of-way are not within the statute, then the reader of the statute is faced with a problem of interpretation. The phrase upon which Heppner and Jordan rely, "damages in connection with or resulting from activities along or in the vicinity of the ... right-of-way," is so broad that common sense tells us that line drawing is necessary; but the phrase itself is of no help in telling us where to draw the line. However, the remainder of the section at least raises an inference that the thrust of the strict liability feature was directed to environmental concerns. Immediately after the strict liability language, Congress stated that damages would be paid "without regard to ownership of any affected lands, structures, fish, wildlife, or biotic or other natural resources . . . ."

When we leave the section itself and review it in context with the other parts of the statute, it becomes clear that environmental damages were at least a special concern of Congress. This suggests the possibility that automobile and construction accidents might not be covered. Thus, though the language of the particular part of the section is clear and unambiguous, *Watt* dictates that in a case such as this, we should consult the legislative history to see if these accidents lie outside the area of strict liability intended by Congress.

## III

We need not detail the legislative history as it supplies overwhelming evidence that the intent of Congress in the strict liability provision of section 1653 was to deal with the environmental risks of the pipeline. Even accepting this, however, Jordan and Heppner argue that they must prevail unless the legislative history explicitly contradicts the interpretation of the statute imposing strict liability for personal injuries. They argue that the literal terms of the statute may be overridden by legislative history only if the literal terms lead to an absurd result and the legislative history explicitly contradicts the literal words. *See Crooks v. Harrelson*, 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156 (1930).

This argument again represents an overly mechanical approach to statutory interpretation. When the statutory language together with the legislative history makes one interpretation overwhelmingly more plausible than a second interpretation, there is no necessity that the legislative history explicitly rule out the second interpretation. In the light of more recent cases, *Crooks v. Harrelson* should be seen as standing for the following proposition: if evidence drawn from the face of the statute militates strongly for one interpretation, but not quite so strongly that the legislative history may safely be ignored, the legislative history should be considered, but considered cautiously. Under these circumstances a second interpretation should be accepted on the basis of the legislative history only if the evidence is very strong, which will usually require explicit language.

This is not the situation in the present case. Evidence drawn from the face of the statute raises serious questions whether we should read the strict liability language literally and should give it its broadest possible sweep. An explicit denial in the legislative history of the distant possibilities included within that sweep is not required. Instead we need only see if the purpose of the Act, as revealed by the legislative history, confirms that the language should not be read too broadly.

We are not required to turn our backs on the overwhelming evidence of the legislative history that the strict liability provision of the Act was intended to deal with environmental accidents rather than ordinary torts. We conclude, therefore, that the district judge was correct in dismissing the actions of Jordan and Heppner.

AFFIRMED.