**UNITED STATES of America, ex rel. Sanford B. WEISS, Plaintiff,**

v.

**Gerald M. SCHWARTZ; James R. Regnolds; Gerald M. Schwartz & Co., a California corporation, dba Schwartz & Regnolds; the Park Lane, a Limited Partnership; and Nate Corenman, Defendants.**

**No. C-81-3969 Rep.**

United States District Court,
N. D. California.

Aug. 30, 1982.

James J. Feder, Los Angeles, Cal., for plaintiff Stanford B. Weiss.

John F. Barg, Chief Civil Division, Asst. U. S. Atty., San Francisco, Cal., Charles L. Schlumberger, Dept. of Justice, Washington, D. C., Emmett N. Roden, Dept. of Housing & Urban Development, Washington, D. C., for plaintiff United States.

Joseph J. Appel, Ropers, Majeski, Kohn, Bentley, Wagner & Kane, San Francisco, Cal., Alexis J. Perillat, McCarthy & Perillat, 605 Market Street, 11th Floor San Francisco, Cal., for defendants.

### MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

Sanford B. Weiss, the *qui tam* plaintiff under the False Claims Act, 31 U.S.C. § 232, moves to vacate the stipulated dismissal without prejudice entered into by the United States and the defendants on April 1, 1982. For the reasons set forth below, we grant plaintiff's motion and hereby vacate the April 1 stipulation of dismissal.

For purposes of this discussion, we adopt the Government's statement of facts. Plaintiff Weiss was the owner-mortgager of The Park Lane, a multi-resident housing project in Monterey, California. The mortgage on the project was held by a private lender and covered by a deed of trust securing a promissory note insured by the Federal Housing Administration under the National Housing Act, 12 U.S.C. § 1715v(b). In October 1968, after Weiss fell into default, the note, deed of trust, and a chattel mortgage on the personal property located at the project were assigned to the Department of Housing and Urban Development ("HUD"). In April 1969, HUD instituted foreclosure proceedings and simultaneously became mortgagee-in-possession. In September 1971, HUD, as mortgagee-in-possession, entered into a project management contract with Gerald M. Schwartz & Company under which that company agreed to manage The Park Lane. At some point between September 1971 and September 1974, James R. Regnolds became associated with Gerald M. Schwartz & Company, which subsequently became known as Schwartz & Regnolds (hereinafter, "the management partnership"). In September 1974, a foreclosure sale was held and HUD purchased The Park Lane. Simultaneously, HUD entered into a second property management contract with the management partnership, which continued to manage the project until December 1975. At that point, Regnolds dropped out of the management partnership so that he could bid to purchase the project from HUD. Schwartz continued to manage the project.

Subsequently, Regnolds joined with Nate Corenman to form a limited partnership called The Park Lane (hereinafter, "the purchasing partnership"). Through this partnership, Regnolds and Corenman submitted a bid to HUD for the purchase of the project. Their bid was accepted by HUD in April 1976, and the sale was completed in June 1976. After the sale was completed, Schwartz obtained Corenman's interest in the purchasing partnership.

In October 1981, Weiss, suing on behalf of the United States, filed the instant action against Schwartz, Regnolds, Corenman, the purchasing partnership, and the management partnership pursuant to the False Claims Act, 31 U.S.C. § 232(B). In essence, Weiss alleges in the *qui tam* complaint that the defendants conspired to commit and did commit various fraudulent acts to diminish the value of the project, to discourage competitive bidding, and then to purchase the project. Pursuant to 31 U.S.C. § 232(C), the Government made an entry of appearance and assumed prosecution of the action on December 3, 1981. On April 1, 1982, the Government filed a stipulation for dismissal without prejudice. Weiss now seeks to set aside that dismissal, claiming that the Government cannot dismiss a *qui tam* action that it has taken over. We agree with the Government that the single issue before us is whether the Government may dismiss a *qui tam* action in which it has entered an appearance four months previously.

The language of the Federal False Claims Act itself, not surprisingly, is not dispositive of this issue. 31 U.S.C. § 232(C) states in pertinent part:

The United States shall have sixty days, after service as above provided, within which to enter appearance in such suit. If the United States shall fail, or decline in writing to the court, during said period of sixty days to enter any such suit, such person may carry on such suit. If the United States within said period shall enter appearance in such suit the same shall be carried on solely by the United States. In carrying on such suit the United States shall not be bound by any action taken by the person who brought it, and may proceed in all respects as if it were instituting the suit: *Provided*, That if the United States shall fail to carry on such suit with due diligence within a period of six months from the date of its appearance therein, or within such additional time as the court after notice may allow, such suit may be carried on by the person bringing the same in accordance with clause (B) of this section. The court shall have no jurisdiction to proceed with any such suit brought under clause (B) of

this section or pending suit brought under this section whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought . . . .

The Government and defendants focus on the language above which states that, once the United States enters an appearance, it "may proceed in all respects as if it were instituting the suit." Plaintiff, contrariwise, focuses on the subsequent *proviso* which allows the informer to resume prosecution of the action if the Government has failed to act diligently within a period of six months.

█ As all parties admit, there is no case law directly on point to guide us on this issue. In this uncertain situation, it is clear that we must examine the relevant legislative history in search of the intent of Congress. *See Train v. Colorado Public Interest Research Group, Inc.*, 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976) (courts should examine relevant legislative history in search for intent of Congress if such examination would aid construction); *Heppner v. Alyeska Pipeline Serv. Co.*, 665 F.2d 868, 871 (9th Cir. 1981).

The original False Claims Act was passed in 1863 to aid the Government during the Civil War. At that time there was not yet a Federal Bureau of Investigation and the United States Attorney General's staff was quite modest. The Department of Defense [then the War Department] had no investigators to check on its various suppliers and contractors. The Government was largely dependent upon information received from private individuals concerning fraudulent claims against it. Accordingly, the False Claims Act provided for private individuals to bring suits against the perpetrators of such fraud regardless of whether the plaintiff had discovered or furnished the information relative to the fraud sued upon or simply based his action entirely upon infor-

mation secured by the Government in a criminal proceeding. *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943). Although the plaintiff was liable for his own costs and had no claim against the United States for prosecuting the action, he was entitled to one-half of the forfeiture, one-half of the damages, and all costs the court might award against the defendant should the plaintiff prevail.

By 1943, so-called "parasitic" suits (*i.e.*, suits based solely on public or quasi-public information usually obtained from criminal indictments) had become such a problem that the Attorney General felt compelled to write to the Chairman of the Senate Judiciary Committee. In September 1943, there were approximately twenty-five informer suits pending,[1] constituting a total demand of almost $150,000,000—a potential recovery of $75,000,000 to the informers. According to the Attorney General, almost all of these suits were of the "parasitic" type. The Attorney General, writing earlier in March of that year, explained:

[W]henever a grand jury returns an indictment charging fraud against the Government there may be a scramble among would-be informers to see who can be the first to file civil suit based on the charges in the indictment. There are now pending 19 such suits. In 18 of these suits the basic allegations of the informers' pleadings were copied from the indictments.

To offset this condition the Department of Justice has undertaken to file civil actions at the same time that indictments are returned. But this has been found impractical. The exact time an indictment will be returned can rarely be anticipated. Moreover, this make-shift practice does not give adequate time in which to prepare proper pleadings.

I believe that Congress should by legislation put a stop to this unseemly and undignified scramble. The Government

---

1. There are indications that the number of informer suits may have increased further at a dramatic pace by the end of 1943. *See* Re-

marks of Congressman Walter, 89 Cong.Rec. 10846 (Dec. 17, 1943).

should have sufficient time in which carefully to consider the advisability of bringing such suits and the nature and contents of the pleading to be filed, instead of being forced to proceed in the hasty manner which alone is now available. Letter of Attorney General Francis Biddle to Senator Frederick Van Nuys, March 22, 1943, 89 Cong.Rec. 7571 (Sept. 15, 1943).

The original response proposed by the House was to abolish completely *qui tam* actions. The Senate declined to follow the House's lead. Instead, the Senate was in favor of allowing *qui tam* actions to survive when "based upon information, evidence, or sources not then in the possession of the United States, unless obtained from such person (bringing the suit) by the United States in the course of any investigation by a grand jury, congressional committee, or other public body, or before a United States Commission, or other proceeding instituted or conducted by it." 89 Cong.Rec. 10845 (Dec. 17, 1943).

The bill was then referred to the Conference Committee, which substituted the language which now appears in the statute. The Conference Report stated:

> Jurisdiction is denied to the court to proceed with any suit brought under clause (B) or pending suit brought under section 3491 of the Revised Statutes (private suits) whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought.

89 Cong.Rec. 10845 (Dec. 17, 1943).

It is not clear how or why the Conference Committee reached the particular compromise it did. *See Pettis ex rel. United States v. Morrison-Knudsen Co.,* 577 F.2d 668, 671 (9th Cir. 1978). For the purposes of the motion before us, however, it is significant to note that the debate was focused on whether the informer's evidence and information had to be original (the so-called "honest" informer). There was very little discussion whether, assuming the information *was* original, the informer could still be precluded from prosecuting the suit even though the Government declined to prosecute. What little information can be discerned from the Congressional Record, however, indicates that the *qui tam* plaintiff should be allowed to take over the prosecution, if the Government has stepped aside and if the informer has proffered original information.

Consider the following colloquy between two senators during the debate over the 1943 amendments to the False Claim Act:

> Mr. DANAHER: After everything is said and done, as a practical matter this bill would effectually preclude suits by informers to recover in their own names for frauds perpetrated against the United States unless certain conditions named in the bill were met [*e.g.,* the information must be original and must first be turned over to the Attorney General; the Government must be given the opportunity to enter an appearance; etc.].
>
> Mr. VAN NUYS [Chairman of the Senate Judiciary Committee]: That is correct.
>
> Mr. DANAHER: If, in fact, those conditions are met, the suit may still be brought, whether the Attorney General agrees that there is a cause of action or not.
>
> Mr. VAN NUYS: The Senator is correct.

89 Cong.Rec. 7574 (Sept. 15, 1943).

This exchange indicates that the Senators believed an honest informer could prosecute the false claims action, even if the Government wished to dismiss the action as meritless.

Two days later, Senator Ferguson, speaking on behalf of the Senate version, stated:

> The responsibility to prevent frauds is on the Government as well as on the citizen. When the citizen gives the facts to the Government the case should be prosecuted by the Government, but the citizen should be able to use his original evidence to prosecute in case the Government does not do so.

89 Cong.Rec. 7604 (Sept. 17, 1943). Granted, the bill that Senator Ferguson spoke on behalf of was not yet in its adopted form. The subsequent changes, however, addressed the issue of original versus "parasitic" information; they did not address the right of a citizen "to use his original evidence to prosecute in case the Government does not do so."

After the Conference Committee agreed upon the current form of the statute, it was presented to the House by one of the House managers, Congressman Walter. The Congressman first discussed the effect of the statute on pending suits:

> Now, as to the cases where the United States feels there is no ground for recovery, in those cases the United States may become a party by merely intervening. Then if the United States decides that there is no case and gets out of it the individual may proceed on his own.

89 Cong.Rec. 10846 (Dec. 17, 1943).

■ He then discussed the effect of the statute on future cases:

> In every case that will be brought in the future it will be necessary for the suitor to notify the United States attorney in the district in which the action is to be brought, and the Attorney General, in writing of the material facts of the suit. If the Attorney General fails to proceed, then the citizen may proceed on his own. It is then his case. He may proceed and recover if he can, and can be compensated for his work.

*Id.* We feel that there is little difference between the reasoning implicit in the first and second paragraphs above. Congress told the Attorney General he could intervene in pending cases and that, if he later thought they did not warrant prosecution, he could drop out of the case. At that point, the private citizen was allowed to "proceed on his own." Similarly, Congress told the Attorney General he could enter an appearance in all future cases and, if he later found them to be meritless, he could

decide not to proceed. At that point, the individual citizen may "proceed on his own." Nowhere in the Congressional Record is it indicated that the Attorney General may enter an appearance and, upon subsequently determining the case to be without merit, dismiss the case. Rather, the case becomes that of the private citizen.

Congress sought to amend the Civil War False Claims statute because it was being exploited by individuals who obtained enormous windfall damages from prosecuting "parasitic" lawsuits. There is no indication that Congress sought to give the Attorney General the power to terminate lawsuits he thought meritless if the information itself was original.

> Mr. SPRINGER: And this particular bill [31 U.S.C. § 232] is intended to correct that sort of [parasitic] procedure and stop that sort of racketeering?
>
> Mr. WALTER: Exactly. We have no desire to interfere with suits which are brought honestly and legitimately by informers which the United States were not party to.

89 Cong.Rec. 10846 (Dec. 17, 1943).

■ While admittedly sparse, we believe the relevant legislative history gives rise to the finding that Congress intended that, *assuming* the inapplicability of the jurisdictional bar,[2] the informer could pursue his claims should the Government decline to prosecute. The 1943 amendments were adopted to insure that the Government was given the opportunity to prosecute such claims, not to preclude the honest informer from his day in court.

The parties discuss the one case which appears to address the instant problem, *United States ex rel. Coates v. St. Louis Clay Prod. Co.*, 68 F.Supp. 902 (E.D.Mo. 1946). The court in *Coates* explained:

> Whether the United States is the real party in interest, an informer suit under the 1943 amendment, 31 U.S.C.A. § 232, may be brought and carried on by any person as well for himself as for the United States. The amended act gave

---

2. The district court does not have jurisdiction of a suit brought by an informer unless based on evidence and information not in the possession of the United States or its agencies or employees at the time of filing. *See* 31 U.S.C. § 232(C) and discussion, *supra.*

the Government a certain period within which to take over a suit initiated by an informer and thereafter to carry on the suit and to proceed "in all respects as if it were instituting the suit". However the law provides that if the United States fails to carry on the suit "with due diligence * * * such suit may be carried on by the person bringing the same. We think these provisions of the law are susceptible of only one interpretation as respects the present question and that is, even though the Government agents' conclude, for reasons sufficient to satisfy them, that recovery cannot be made on alleged fraudulent claims, such conclusion does not preclude a citizen from maintaining the suit if he can meet the statutory test on revealing information. Assuming the Government would take over any cause in which they thought recovery probable, it is only when the Government reaches a contrary conclusion and for that reason elects not to prosecute the action that the informer will be permitted to maintain the suit. The purpose of the informer statute, as now on the books, is to permit citizens to prosecute this class of action when the Government has failed to do so by failure either to initiate or to take over. It may well be that Government representatives, with the facts of this case before them, drew a conclusion of non-liability. This Court is not bound by their conclusion. This Court may draw a different conclusion from the same facts and a jury may do likewise.

*Id.* at 904–05.

The Government dismisses the above language as *dictum* from an old and remote case. This may be true. Nevertheless, the case is important for two reasons. First, although arguably *dictum*, it is the only discussion in the case law of the issue before us and the conclusion reached therein coincides with the sparse discussion in the Congressional Record. Second, Mr. Coates was a well-known and well-respected informer who not only testified before the Senate Judiciary Committee during its hearings on the proposed amendments to 31 U.S.C. § 232, but also convinced the Justice Department and the Congress that his then-pending false claims suits should be exempted from the effects of the amended statute.[3] To this end, Congress added the following final *proviso* to section 232(C) almost solely so that Coates, who filed his suit prior to the 1943 amendments, could continue to prosecute his case:

> ... *Provided, however,* That no abatement shall be had as to a suit pending on December 23, 1943, if before such suit was filed such person had in his possession and voluntarily disclosed to the Attorney General substantial evidence and information which was not theretofore in the possession of the Department of Justice.

We may assume, therefore, that the Eastern District of Missouri was well aware of Congress's intent when it spoke in the *Coates* case. That court's interpretation of the recently-passed statute should not simply be dismissed as remote.

The Government argues finally that public policy dictates that the Government be allowed to terminate vexatious, meritless

---

**3.** [W]e spent days and days in public hearings and in conference in company with Mr. Tom Clark, the Attorney General, and others representing the Department of Justice, trying to appease a certain member or members of the Committee on the Judiciary who conscientiously, I admit, objected to the repeal of the present law in its entirety. Those efforts were made to protect honest, bona fide informers; and there are some of that class. One was a man from St. Louis, as I remember, named Coates. He had a suit against some concern in St. Louis. He appeared personally before the committee, made a fine appearance and impression, and had spent considerable money in prosecuting his case and in bringing it to issue. We exempted him; and Tom Clark assured him, in front of the full committee ... that under the terms of the amendment now under discussion, in no case would he move to dismiss that pending suit, so that Mr. Coates could continue to prosecute the suit to a finish.
Remarks of Senator Van Nuys, Chairman of Judiciary Committee, 89 Cong.Rec. 7572 (Sept. 15, 1943); *see also* 89 Cong.Rec. 7578 (Sept. 15, 1943), 89 Cong.Rec. 7606, 7609 (Sept. 17, 1943), and 89 Cong.Rec. 10848, 10849 (Dec. 17, 1943).

*qui tam* suits which are improvidently filed against innocent defendants. We believe this argument ignores relevant legislative history. First, Congress provided its own disincentive to meritless suits by making the informer completely liable for the costs of prosecution (unless the court awarded such costs to a prevailing plaintiff). The legislative history makes clear that many Congressmen thought this was a sufficient deterring force to prevent persons from bringing unnecessary suits even without the 1943 amendments. *See* 89 Cong.Rec. 7611 (Sept. 17, 1943).

Second, it is absolutely clear from the congressional debates that one of Congress's biggest fears in amending the Civil War False Claims statute was that a corrupt Attorney General or other public official might be able to thwart a legitimate investigation and prosecution of fraudulent claims.[4] It is predominantly for this reason that the Senate rejected the original House bill which would have completely eliminated *qui tam* suits. While we agree with the Government that the judiciary should always be concerned that the courts not be used as vehicles for harassment, that is true in every case, not just *qui tam* actions. Congress intended for the honest informer to retain his right to prosecute fraud against the Government. That right may be taken over, but it may not be taken away.

We are cognizant of language in *Pettis, supra,* emphasized by the defendants, to the effect that the plaintiff may not prosecute his claim if the Government is apprised of the facts and fails to act. 577 F.2d at 673.

The *Pettis* court, however, was speaking of the scope of the jurisdictional bar; it was not addressing the issue before this court.[5]

However, the *Pettis* decision does make clear that a court should decline to proceed as soon as it becomes evident that the information on which the *qui tam* action is predicated was in possession of the Government before the suit was filed, even when the information has been given to the United States by the informer himself. Both the Government and the defendants have submitted briefs which indicate that this court may lack jurisdiction over the instant case on this basis. The *qui tam* plaintiff, however, has not responded to these allegations. Following the guidance of *Pettis,*[6] therefore, we hereby inform the plaintiff, Weiss, that he has thirty (30) days from the date of the filing of this order in which to reply to these arguments of the Government and the defendants and to attempt to rebut the application of the jurisdictional bar. Upon receipt of plaintiff's brief, the court will then decide whether a full hearing on the issue of jurisdiction is warranted.

IT IS SO ORDERED.

---

4. We, of course, do not mean to imply that the United States Attorney's Office possessed other than the highest motives when it stipulated to a dismissal in the instant case.

5. The *Pettis* court also stated that "only by assuming a corrupt and enfeebled federal government" would the public benefit be served by allowing an informer to bring a private suit *after* the United States, being apprised of the facts, fails to act. 577 F.2d at 668. Again, however, the court was speaking of the jurisdictional bar when it made this statement; it was not referring to the situation where an honest informer wishes to prosecute his case

after the United States enters an appearance and soon thereafter stipulates to a dismissal.

6. While it might have been preferable for the district judge to have told appellant explicitly that he was not going to hold a hearing, and then give him another chance to produce documents or affidavits, he did not abuse his discretion in reaching his decision on the basis of the affidavits presented by the defendant in view of the appellant's complete failure to supply anything other than conclusory allegations.
577 F.2d at 674.