# Application of the Resource Conservation and Recovery Act to the Department of Energy's Atomic Energy Act Facilities

The nuclear production and weapons facilities that are operated by the Department of Energy (DOE) pursuant to the Atomic Energy Act (AEA) are generally subject to the requirements of the Resource Conservation and Recovery Act (RCRA) governing the disposal of solid wastes, including applicable standards, regulations, permit requirements, and enforcement mechanisms. 42 U.S.C. § 6961.

Particular RCRA regulations or requirements may not apply to DOE facilities when the application of such regulation or requirement would be inconsistent with specific requirements of the AEA that flow directly from DOE's statutory mandate to develop and use atomic energy. 42 U.S.C. § 6905(a).

Whether a particular RCRA regulation or requirement is inconsistent with the requirements of the AEA must be analyzed by DOE and the Environmental Protection Agency on a case-by-case basis. However, § 1006(a) of RCRA, 42 U.S.C. § 6905(a), should relieve DOE from compliance with RCRA regulations or requirements (1) if they conflict with prescriptive directives contained in the AEA itself, such as the AEA restrictions on public disclosure of restricted data; (2) if compliance would prevent DOE from carrying out authorized AEA activities; or (3) if compliance would be inconsistent with specific operational needs of a facility that are unique to the production of nuclear material or components. In addition, a state may not exercise veto power over the establishment or operation of a DOE facility, either by denying necessary permits, or by seeking injunctive relief, because of noncompliance with a RCRA regulation that is inconsistent with the AEA.

February 9, 1984

MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL,
LAND AND NATURAL RESOURCES DIVISION

This responds to your request for our analysis regarding whether, or to what extent, the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.* (RCRA) applies to chemical wastes generated by nuclear production and weapons facilities owned by the Department of Energy (DOE) and operated under authority provided by the Atomic Energy Act of 1954, as amended, 42 U.S.C. §§ 2011 *et seq.* (AEA). The context for your request is a difference of opinion between DOE and the Environmental Protection Agency (EPA) over whether waste treatment and disposal facilities and methods used at DOE's Atomic Energy Act plants are subject to RCRA standards, permit requirements, and enforcement mechanisms. DOE has taken the position that § 1006(a) of RCRA, 42 U.S.C. § 6905(a), which provides that RCRA does not apply to "activit[ies] . . . subject to . . . the Atomic Energy Act of 1954 . . . except to the

6

extent such application (or regulation) is not inconsistent with the requirements of such Act[]," exempts its AEA facilities from all RCRA regulation. EPA contends that DOE's AEA facilities are subject to RCRA, as are all other federal facilities, but that specific RCRA regulations may not apply to some aspects of DOE's operations, if application of those regulations would be inconsistent with particular requirements flowing directly from the language or purpose of the AEA.[1]

We have received submissions from DOE and EPA on the applicability of RCRA, including copies of previous correspondence between those agencies on the issue. Based on our review of those materials, discussions with your Division and personnel at DOE and EPA, and our own research, we have concluded that EPA's interpretation of § 1006(a) represents the sounder view of the law. For the reasons set forth below, we conclude that DOE's Atomic Energy Act facilities are generally subject to the requirements of RCRA, including compliance with applicable standards, regulations, and permitting requirements, and are generally subject to the enforcement mechanisms established by RCRA. Section 1006(a) leaves open the possibility, however, that particular RCRA regulations or requirements are not applicable to DOE's facilities, or to a particular facility, because such regulations or requirements would be "inconsistent with the requirements of [the AEA]." We do not interpret "requirements of [the AEA]," as used in § 1006(a), as broadly as DOE urges, *i.e.,* to encompass all DOE regulations, orders, and directives that apply to, or may affect, health and safety aspects of its Atomic Energy Act facilities. Rather, in order to give reasonable content to § 1006(a), we must interpret the term "requirements" more narrowly, as EPA urges, in light of the somewhat different purposes of the AEA and RCRA.

Thus, we believe that § 1006(a) would relieve DOE from compliance with RCRA only in particular circumstances where DOE can demonstrate that application of a regulation or requirement would be inconsistent with specific requirements of the AEA that flow directly from DOE's statutory mandate to develop and use atomic energy. Although it is difficult in the absence of particular facts to give precise content to the term "requirements," we believe DOE could demonstrate that particular aspects of RCRA should not apply to operation of its facilities (or particular facilities), for example: if the RCRA regulation would conflict with prescriptive directives contained in the AEA itself, including principally the restrictions on public disclosure of "restricted data;"[2] if compliance would prevent DOE from carrying out authorized Atomic Energy Act activities; or if compliance with a particular regulation or require-

---

[1] DOE's position has been challenged in recently filed litigation involving DOE's Y-12 Plant in Oak Ridge, Tennessee, at which nuclear weapons components are fabricated and assembled. *Legal Envt'l Assistance Found.* v. *Hodel,* C.A. No. 3-83-52 (E.D. Tenn filed Sept. 20, 1983). In addition, we understand that DOE is currently negotiating with officials in South Carolina with respect to regulation of waste handling at Atomic Energy Act facilities in that state, and that those officials have taken the position that operation of those facilities should be conditioned on receipt of state waste handling permits under the RCRA scheme.

[2] *See* 42 U.S.C. §§ 2161–2168.

ment would be inconsistent with specific operational needs of a facility that are unique to the production of nuclear material or components.

Obviously, this interpretation does not provide an exact or necessarily comprehensive standard. We attempt below to provide as much guidance as possible to you and to EPA for implementation of our conclusions. In the abstract, however, we cannot determine which particular aspects of RCRA, or particular regulations, would be "inconsistent with the requirements of [the AEA]." That determination must be made by your agency and EPA based on an analysis, from both a general and a facility specific perspective, of how implementation of RCRA will affect the operation of DOE's Atomic Energy Act facilities.

## I. Background

RCRA, passed in 1976, established a broad regulatory scheme governing the generation, transportation, storage, and disposal of solid wastes. Under that Act, the practice of "open dumping" is prohibited, see 42 U.S.C. § 6945, and the states are encouraged by federal financial and technical assistance to prepare and submit to EPA for approval overall plans for regulation of solid waste. See id. §§ 6931, 6948. The treatment, storage, and disposal of solid wastes considered by EPA to be "hazardous wastes"[3] are subject to a permit requirement, see id. § 6925, and generators, transporters, and owners or operators of facilities for the treatment, storage, and disposal of solid wastes must meet such minimum standards promulgated by EPA "as may be necessary to protect human health and environment." See id. §§ 6922, 6923, 6924. As under the regulatory schemes established by the Clean Air Act, 42 U.S.C. §§ 7401 et seq., and the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq. (FWPCA), RCRA authorizes the states to administer the regulatory scheme, including issuance of permits and enforcement of sanctions for violations, if the Administrator of EPA finds that a state's regulatory scheme is "equivalent" to the federal scheme.[4] No state may impose any requirements for the management of hazardous wastes that are less stringent than the standards promulgated by EPA, but states are expressly authorized to impose requirements that are more stringent than federal standards. See 42 U.S.C. § 6929. RCRA also provides for private "citizens suits" against persons, including the United States, for violation of any permit, standard, regulation, condition, requirement, or order that has become effective pursuant to RCRA. See id. § 6972.

---

[3] "Hazardous waste" is defined by RCRA to mean "a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may —

(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed."

42 U.S.C. § 6903(5). EPA is responsible for identifying the characteristics of hazardous wastes and listing particular hazardous wastes that are subject to the hazardous waste management provisions of RCRA. Id. § 6921.

[4] Compare 42 U.S.C. § 6926 (RCRA) with 42 U.S.C. § 7410 (Clean Air Act) and 33 U.S.C. § 1342 (FWPCA)

8

The question before us is whether the regulatory scheme imposed by RCRA, including both federal and state regulation of hazardous wastes, applies to chemical wastes produced by DOE's production and weapons facilities operated pursuant to authority provided in the AEA.[5] These facilities, which are generally owned by DOE and operated by private contractors, produce special nuclear material and components used in research, development, testing, and production of nuclear weapons.[6] Operation of the facilities generates various waste streams, including chemical wastes that are considered to be "hazardous wastes" under EPA criteria and regulations. These wastes are generated by a variety of industrial processes, including metal working, electroplating, chemical extraction, machining, fabrication, and assembly and cleaning of solvent parts.

Our analysis here turns on the two sections of RCRA that deal with regulation of federal facilities and activities: § 6001, 42 U.S.C. § 6961, which explicitly subjects all federal facilities and activities to state and federal regulation under RCRA; and § 1006(a), 42 U.S.C § 6905(a), which precludes regulation under RCRA of any "activity or substance" subject, *inter alia,* to the AEA "except to the extent such application [of RCRA] (or regulation) is not inconsistent with the requirements of such Acts." Section 6001 provides in pertinent part:

> Each department, agency, and instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any solid waste management

[5] The question we address here is applicability of RCRA to *nonnuclear* wastes generated by DOE's facilities. The only materials that can be regulated under RCRA are "solid wastes" and "hazardous wastes" (which are a subset of "solid wastes"). Section 1004(27) of RCRA, 42 U.S.C. § 6903(27), expressly exempts from the definition of "solid waste": "source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended." Thus, RCRA leaves undisturbed DOE's authority to regulate the disposal of source, special nuclear, and byproduct wastes, which we understand are for the most part handled separately from nonnuclear wastes. DOE has not indicated that its waste streams include other nuclear material that does not fall within the categories of source, special nuclear, and byproduct wastes.

[6] DOE, as successor to the Atomic Energy Commission's research and development responsibilities, *see* 42 U.S.C. §§ 5814(c), 5817 (1976) (transfer of functions to Energy Research and Development Administration); 42 U.S.C. § 7151 (Supp. V 1981) (transfer of functions from Energy Research and Development Administration to DOE), is authorized by § 31(a) of the AEA, 42 U.S.C. § 2051(a), to make arrangements for the conduct of research and development activities relating to

    (1) nuclear processes;

    (2) the theory and production of atomic energy, including processes, materials, and devices related to such production;

    (3) utilization of special nuclear material and radioactive material for medical, biological, agricultural, health, or military purposes;

    (4) utilization of special nuclear material, atomic energy, and radioactive material and processes entailed in the utilization or production of atomic energy or such material for all other purposes, including industrial or commercial uses, the generation of usable energy, and the demonstration of advances in the commercial or industrial application of atomic energy;

    (5) the protection of health and the promotion of safety during research and production activities; and

    (6) the preservation and enhancement of a viable environment by developing more efficient methods to meet the Nation's energy needs.

*Id.* DOE is further authorized to "produce or to provide for production of special nuclear material in its own production facilities," *id.* § 2061(b), to perform research and development work in the military application of atomic energy, *id.* § 2121(a), and to engage in the production of atomic weapons, *id.*

9

facility or disposal site, or (2) engaged in any activity resulting, or which may result, in the disposal of solid waste or hazardous waste shall be subject to, and comply with, all Federal, State, interstate, and local requirements, both substantive and procedural (including any requirement for permits or reporting or any provisions for injunctive relief and such sanctions as may be imposed by a court to enforce such relief), respecting control and abatement of solid waste or hazardous waste disposal in the same manner, and to the same extent, as any person is subject to such requirements, including the payment of reasonable service charges. Neither the United States, nor any agent, employee, or officer thereof, shall be immune or exempt from any process or sanction of any State or Federal Court with respect to the enforcement of any such injunctive relief.

This section further provides that the President may exempt any "solid waste management facility"[7] of any Executive Branch department, agency, or instrumentality from compliance with RCRA requirements "if he determines it to be in the paramount interest of the United States to do so." *Id.* Section 6001 was modeled on parallel provisions in the Clean Air Act and the FWPCA, both of which subject federal facilities to the regulatory schemes imposed by those Acts and provide for Presidential exemptions.[8]

If § 6001 were the only provision dealing with the applicability of RCRA to federal facilities or activities, our analysis would end here. The operation of DOE's Atomic Energy Act facilities is plainly an "activity resulting . . . in the disposal of hazardous wastes," and therefore within the explicit waiver of sovereign immunity for federal facilities provided by § 6001.[9] Indeed, we understand that DOE does not contest the applicability to those facilities of the FWPCA.[10] Specific problems that have arisen because of the application of the FWPCA to DOE's Atomic Energy Act facilities have been dealt with through negotiations between EPA and DOE, resulting in most cases in agreements that govern DOE's compliance with the FWPCA.

---

[7] RCRA's definition of this term includes systems for collection, separation, recycling, and recovery of solid wastes, systems for resource conservation, and facilities for the treatment of solid wastes. *See* 42 U.S.C. § 6903(29).

[8] *See* 42 U.S.C. § 7418 (Clean Air Act); 33 U.S.C. § 1323 (FWPCA), *discussed in* S. Rep. No. 988, 94th Cong., 2d Sess. 24 (1976).

[9] Given the broad definition of "solid waste management facility," DOE's Atomic Energy Act facilities would in most cases also be considered "solid waste management facilities;" if wastes were disposed on site, DOE would be considered to have jurisdiction over "disposal sites." Therefore those facilities would probably also fall within the first category of federal facilities described in § 6001.

[10] The FWPCA does not include a provision comparable to § 1006(a) of RCRA making the FWPCA subordinate, at least in some circumstances, to the AEA or other statutes. Rather, the effect of § 511(a) of the FWPCA, 33 U.S.C. § 1371(a), is to make the FWPCA prevail in the event of inconsistencies between that Act and other laws or regulations. Section 511(a) provides, in pertinent part, that "[t]his chapter [FWPCA] shall not be construed as . . . limiting the authority or functions of any officer or agency of the United States under any law or regulation not inconsistent with this chapter."

Because the Clean Air Act is not generally enforced through a permit system, DOE has not had relevant experience with potential inconsistencies between the AEA and that Act.

10

However, unlike the FWPCA, RCRA explicitly addresses, in § 1006(a), its relationship to certain other statutes, including the AEA. Section 1006(a) provides in full text that:

> *Nothing in this chapter shall be construed to apply to (or to authorize any State, interstate, or local authority to regulate) any activity or substance which is subject to* the Federal Water Pollution Control Act [33 U.S.C. §§ 1251 *et seq.*], the Safe Drinking Water Act [42 U.S.C. §§ 300f *et seq.*], the Marine Protection, Research and Sanctuaries Act of 1972 [33 U.S.C. §§ 1401 *et seq.*], or *the Atomic Energy Act of 1954 [42 U.S.C. §§ 2011 et seq.] except to the extent that such application (or regulation) is not inconsistent with the requirements of such Acts.*

42 U.S.C. § 6905(a) (emphasis added).

If operation of DOE's Atomic Energy Act facilities is an "activity . . . subject to . . . the Atomic Energy Act" within the meaning of this section, which we believe it is,[11] § 1006(a) by its terms would preclude application of RCRA regulations or requirements "except to the extent . . . not inconsistent with the requirements of [the AEA]." The crux of the question before us is the meaning of that proviso in § 1006(a).

DOE contends that this proviso proscribes any application of RCRA regulations and requirements to its Atomic Energy Act facilities, and therefore also proscribes any regulatory authority by EPA or the states over those facilities. The comparison required by the language of the proviso and its context within § 1006(a), according to DOE, is between overlapping regulatory *schemes*, not between individual regulations or requirements imposed by those schemes. DOE argues that § 1006(a) is intended to make it clear that RCRA's regulatory scheme would be subordinate to those of other enumerated statutes so as to avoid subjecting the same activity or substance to varying sources of regulation having the potential for conflict. DOE asserts that comparison of the regulatory schemes established by the AEA and RCRA reveals three major inconsistencies in the treatment of federal facilities under those Acts:

> (1) the AEA does not provide for any state role in permitting of federal facilities, while RCRA provides for state permitting programs and enforcement, and allows state requirements to be more stringent than those imposed by federal regulation;

---

[11] It could be argued that the term "activity" as used in § 1006(a) is intended only to include the activity of handling or treating solid wastes, which arguably is not "subject to" the AEA. However, we construe "activity" in § 1006(a) consistently with the use of the same term in § 6001, which provides that any federal *"activity resulting . . .* in the disposal of solid waste or hazardous waste" is subject to RCRA. (Emphasis added.) As we note above, we believe that term clearly includes the operation of DOE's Atomic Energy Act facilities.

11

(2) the AEA places authority in DOE to determine appropriate standards for waste handling for public health and safety, while RCRA places that authority in EPA and the states;[12]

(3) the AEA restricts access to and dissemination of restricted data pertinent to the design or construction of nuclear weapons and production and use of special nuclear material, while RCRA requires that EPA and state officials have access to information on the generation and handling of hazardous wastes and to waste sites, and generally provides for public availability of information.

DOE contends that the cumulative effect of these inconsistencies is to exempt from RCRA's scheme of regulation the operation of DOE's Atomic Energy Act facilities.

EPA accepts the premise that national security and other considerations may require some adjustments in the application of hazardous waste regulations to DOE's Atomic Energy Act facilities and agrees with DOE's assertion that continued operation of certain facilities cannot be dependent on permission granted by state officials. EPA disagrees, however, with DOE's argument that the effect of the "except to the extent . . . not inconsistent" proviso in § 1006(a) is to exempt *entirely* DOE's Atomic Energy Act facilities from RCRA. Rather, EPA interprets that proviso to require a case-by-case comparison of RCRA regulations with specific requirements of the AEA. In that regard, EPA argues that regulations or directives governing hazardous waste treatment and disposal that DOE issues under the authority of § 161(i)(3) would not generally be "requirements of" the AEA, but rather should, for the most part, be considered as incidental to DOE's statutory mandate to promote the development, use, and control of atomic energy.[13] EPA interprets "requirements," as used in § 1006(a), to mean prescriptive directives contained in the statute itself, such as the AEA's provisions governing restricted data, or particular regulations and orders shown to be necessary to implement DOE's particular statutory mandate.

---

[12] DOE cites § 161(i)(3) of the AEA, 42 U.S.C. § 2201(i)(3), as the basis for its authority to prescribe regulations and directives governing the treatment and disposal of solid wastes at its facilities. That section, enacted as part of several general powers granted to the Atomic Energy Commission under the AEA, grants DOE authority to:

> prescribe such regulations or orders as it may deem necessary . . . (3) to govern any activity authorized pursuant to this chapter, including standards and restrictions governing the design, location, and operation of facilities used in the conduct of such activity, in order to protect health and to minimize danger to life or property.

Pursuant to this authority DOE has issued an internal order governing chemical waste disposal practices at its Atomic Energy Act facilities. DOE Order 5480.2 (Dec. 13, 1982). The hazardous waste management procedures established by that order follow, "to the extent practicable," regulations issued by EPA under RCRA, but the order states that facilities administered under the authority of the AEA are not bound by RCRA requirements.

[13] EPA points out that the primary concern of Congress when it passed the AEA in 1954 was to develop a scheme for the promotion of atomic energy and protection of the public from radioactive hazards. The general grant of authority to regulate health and safety aspects of atomic energy facilities should be interpreted in light of the legislative history of the AEA, which EPA asserts does not suggest that DOE is authorized, much less required, to establish a regime for the control of non-radioactive wastes.

12

EPA recognizes that some specific applications of hazardous waste regulations would probably have to yield to regulation by DOE, but believes this conclusion cannot be made on a general, abstract basis, but only with reference to specific AEA activities, and specific aspects of hazardous waste regulation. That review, EPA asserts, should be sufficient to protect DOE's particular concerns about protection of restricted data and the effect of state regulation and permit requirements.

## II. Analysis

Neither the language nor the legislative history of § 1006(a) necessarily provides a dispositive answer to the question before us. However, reading the language of that provision in light of the structure and purpose of both RCRA and the AEA, we conclude that Congress did not intend that section to provide a categorical exemption from RCRA for DOE's Atomic Energy Act facilities. Rather, that section is most reasonably read to establish a priority among those statutes in cases in which a *particular* conflict exists between RCRA and accomplishment by DOE of the congressionally mandated purposes of the AEA.

We start with the language of § 1006(a). Although that language might be said to be somewhat ambiguous, the inclusion of the "except to the extent . . . not inconsistent" proviso suggests that Congress contemplated that some aspects of RCRA would apply to activities and substances subject to the enumerated statutes.[14] DOE interprets that proviso, however, to apply only to privately owned nuclear power facilities licensed by the Nuclear Regulatory Commission (NRC) under the AEA. DOE argues that, absent that proviso, the exemption from RCRA for all "activit[ies] . . . subject to [the AEA]" would encompass the operation of such private nuclear power facilities, and thereby exempt those facilities from state or federal regulation under RCRA — a result DOE argues was clearly not intended by Congress. Thus, DOE contends that inclusion of the proviso was necessary to preserve EPA's jurisdiction under RCRA over the disposal of nonnuclear chemical wastes by *privately owned* nuclear power facilities, but Congress did not also intend to provide for implementation and enforcement of RCRA with respect to federal activities "subject to the [AEA]."

---

[14] This reading is logically intended with respect to the three statutes listed in that section in addition to the AEA: the FWPCA, the Safe Drinking Water Act, and the Marine Protection, Research and Sanctuaries Act of 1972. Those statutes each regulate some aspect of the dumping of materials, including waste products, into bodies of water — an area also subject to regulation under RCRA and therefore potentially involving overlapping and inconsistent regulations. It is most logical to read the "except to the extent . . . not inconsistent" proviso to mean, with respect to those statutes, that in the event of an actual inconsistency between the regulations and obligations required by those statutes and by RCRA, the requirements of the enumerated statutes prevail. This reading is also suggested by § 1006(b), 42 U.S.C. § 6905(b), which directs the Administrator of EPA to "integrate all provisions of RCRA for purposes of administration and enforcement and to avoid duplication, to the maximum extent practicable, with the appropriate provisions of" several statutes administered by the EPA, including the FWPCA, the Safe Drinking Water Act, and the Marine Protection, Research and Sanctuaries Act of 1972. This section indicates clearly that Congress contemplated that RCRA would apply in some respects to activities and substances subject to those three acts.

13

DOE's argument would require us to draw a distinction, for the purpose of § 1006(a), between activities of *federal agencies* "subject to" the AEA and activities of *private individuals* "subject to" the AEA. However, the language of § 1006(a) does not make any such distinction, and no such distinction is suggested in the legislative history of that section. Indeed, DOE's argument could render the proviso completely superfluous, because nothing in the language or legislative history of RCRA would prevent the NRC from making virtually the same argument that DOE makes for categorical exemption from RCRA.[15] Thus, although DOE's interpretation is not entirely implausible, we are not persuaded that it is the correct one, at least in the absence of relevant and clear supporting legislative history.

Unfortunately, the legislative history of RCRA is silent with respect to exactly what Congress did intend § 1006(a) to mean. The language that became § 1006(a) was originally included in the House bill, without explanation. *See* H.R. Rep. No. 1491, 94th Cong., 2d Sess. 53 (1976) (House Report). The House bill did not include a waiver of sovereign immunity for federal facilities comparable to § 6001, but rather included a provision that would have subjected federal agencies to a separate scheme of regulation administered by EPA. *See* House Report at 24–25, 45. The Senate bill, by contrast, adopted the approach used in the FWPCA and the Clean Air Act with respect to federal facilities. Section 4 of the Senate bill added to the existing Solid Waste Disposal Act a new section that would require "[a]ll federal agencies . . . to comply with State and local controls on solid waste and hazardous waste disposal as if they were private citizens. This includes compliance with all substantive and procedural requirements, and specifically any requirements to obtain permits." S. Rep. No. 988, 94th Cong., 2d Sess. 24 (1976) (Senate Report). The Senate bill also included a definition of hazardous waste, not in the House bill, that specifically exempted "source, special nuclear, and byproduct materials," and materials subject to permits under § 402 of FWPCA. *See* Senate Report at 25, 26. The Senate Report notes, with respect to that definition, that "[r]adioactive material is included in the definition of hazardous waste, except to the extent actually regulated under the [AEA]." *Id.* at 26.

Differences between the House and Senate bills were reconciled without a formal conference, and therefore no conference report or statement of managers exists to explain the compromise reached. This compromise substituted the Senate provision that subjected federal facilities to regulation under RCRA, including state regulation, and a definition of solid waste that included the Senate's language excluding source, special nuclear, and byproduct materials.

---

[15] The NRC, as successor to the licensing functions of the Atomic Energy Commission, *see* 42 U.S.C. § 5841(f), is generally subject to the same restrictions, and has many of the same general powers, as DOE, under the terms of the AEA. For example, the NRC and its licensees are fully subject to the "restricted data" provisions of the AEA. Moreover, the NRC could conceivably argue that § 161(i)(3) gives it authority to impose license conditions on private nuclear plants to address hazardous waste disposal problems, and that those conditions are "requirements of" the AEA that would be inconsistent with RCRA, much as DOE has argued. Although we think it highly unlikely that the NRC would make that argument, it would considerably undercut the interpretation of § 1006(a) urged by DOE.

14

The compromise also included the House's language, which became § 1006(a), with respect to the effect of the AEA and other enumerated statutes. The debates on the conference bill do not discuss the for inclusion of that provision, or its intended effect. *See, e.g.,* 122 Cong. Rec. 33817 (Sept. 30, 1976) (remarks of Sen. Randolph); *id.* at 32599 (Sept. 27, 1976) (remarks of Rep. Skubitz).

Although he legislative history does not provide specific guidance on the intended effect of § 1006(a), it contains no indication Congress contemplated that some activities of federal agencies would be wholly exempt from federal and state regulation under RCRA. To the contrary, the language used by both the House and Senate consistently is that "all federal agencies" would be subject to regulation of their solid waste disposal practices, either under the separate regulatory scheme set up by the House bill, or under the waiver of sovereign immunity in the Senate bill. *See, e.g.,* House Report at 5, 48–49; Senate Report at 23.

Moreover, the legislative history of RCRA contains some indication that Congress intended that the solid waste disposal practices of federal agencies be treated comparably to disposal of pollutants under the FWPCA and the Clean Air Act. *See, e.g.,* Senate Report at 24 (noting that § 223 "parallels section 118 of the Clean Air Act and section 313 of the Federal Water Pollution Control Act"); House Report at 45–47 (discussion of Administrative Conference's recommendations). We must assume that Congress was fully aware of the scope of those Acts. We note that the Supreme Court's decision in *Train* v. *Colorado Public Interest Research Group, Inc.,* 426 U.S. 1 (1976), was issued on June 1, 1976, shortly before completion of the Committee reports on the House and Senate bills, and well before adoption of the conference bill in September 1976. That case presented the issue of EPA's jurisdiction under the FWPCA to regulate the discharge of source, byproduct, and special nuclear material into the environment. Respondents included a private nuclear power generating station licensed by the Atomic Energy Commission, and federal facility operated for the Energy Research and Development Administration (the immediate predecessor to DOE's authority) to fabricate plutonium into nuclear weapons parts. *See* 426 U.S. at 4, 5 & n.5. In concluding that the FWPCA did not authorize EPA to regulate discharges of source, byproduct, and special nuclear materials, the Court placed great weight on the legislative history of the FWPCA indicating that Congress understood the AEA's exclusive jurisdiction to extend only to regulation of those radioactive materials. *See* 426 U.S. at 17 & n.14, 21–23. If Congress believed that the Court had misinterpreted the scope of the AEA, or that a different result should obtain with respect to solid waste disposal practices of federal agencies, it could have addressed the issue in the legislative history of RCRA.[16]

---

[16] In RCRA, Congress did set up a scheme slightly different from that of the FWPCA in one respect. As noted above, in the event of an inconsistency the FWPCA by its terms prevails over other federal statutes and regulations. By contrast, § 1006(a) of RCRA provides that RCRA will yield to the AEA in the event of an

Continued

15

In addition, Congress provided in § 6001 for categorical exemptions from federal and state regulation, if the President determines that such exemption would be "in the paramount interest of the United States." 42 U.S.C. § 6961. The inclusion of such authority suggests that Congress intended categorical exemptions from RCRA, such as that urged by DOE, to be obtained through a Presidential waiver, rather than through application of § 1006(a).[17]

Nonetheless, while we cannot construe the language of § 1006(a) to exempt all of DOE's activities under the AEA from RCRA regulation, that section must be interpreted to exempt some aspects of "activit[ies] . . . subject to" the AEA from regulation under RCRA, *i.e.,* if application of RCRA would be inconsistent with particular "requirements" of the AEA. The scope of the term "requirements," as used in § 1006(a), is not illuminated by the language or legislative history of RCRA. The commonly understood meaning of the term implies some prescriptive content, *i.e.,* specific directives that require an agency or a person to take or refrain from taking certain actions, to follow certain procedures, or to meet certain standards and regulations. *See generally Mississippi River Fuel Corp.* v. *Slayton,* 359 F.2d 106, 119 (8th Cir. 1966). For the most part, the AEA does not impose specific prescriptive requirements in that sense, at least with respect to aspects of activities that might overlap with, or be inconsistent with, regulations, standards, and procedures established pursuant to RCRA. Rather, insofar as we consider it here, the AEA generally provides underlying authority for certain types of activities intended to carry out the purposes of the Act.[18] Those purposes focus specifically on the development and use of atomic power for military and civilian applications:

It is . . . declared to be the policy of the United States that —

(a) the development, use and control of atomic energy shall be directed so as to make the maximum contribution to the general welfare, subject at all times to the paramount objective of making the maximum contribution to the common defense and security; and

(b) the development, use, and control of atomic energy shall be directed so as to promote world peace, improve the general

---

[16] (. . . continued)
inconsistency. We do not believe that distinction is material to our analysis here. Those provisions do reflect somewhat different congressional priorities for the two statutes when an *inconsistency exists;* the difference, however, does not lend any particular support to DOE's central legal argument that the relevant comparison under § 1006(a), for the purpose of determining when an inconsistency exists, is between entire regulatory schemes, rather than between particular applications of those schemes.

[17] We note that § 1006(c) of RCRA, 42 U.S.C. § 6905(c), which was added in 1980 by Pub. L. No. 96–482, 94 Stat. 2334, specifically vests in the Secretary of the Interior the exclusive responsibility for implementing hazardous waste regulations with respect to coal mining wastes. Although this section was added to RCRA by a later-enacted statute, and therefore is of limited value in determining the legislative intent of the drafters of § 1006(a), it demonstrates that when Congress intends to carve out a categorical exemption from RCRA for certain types of activities, it can do so in clear and explicit terms.

[18] *See* S. Rep. No. 1699, 83rd Cong , 2d Sess. 14–15, 19, 26 (1954).

16

welfare, increase the standard of living, and strengthen free competition in private enterprise.

42 U.S.C. § 2011.

One exception to this general lack of prescriptive "requirements" in the AEA is afforded by those provisions of the AEA that establish standards and procedures for identification and handling of "restricted data," which is defined to include "all data concerning (1) design, manufacture, or utilization of atomic weapons; (2) the production of special nuclear material; or (3) the use of special nuclear material in the production of energy." 42 U.S.C. § 2014(y). Subchapter II of the AEA requires that such data be handled pursuant to detailed provisions governing its protection and disclosure. 42 U.S.C. §§ 2161–2168.[19] We believe that these provisions fall within the commonly understood meaning of the term "requirements," and therefore that particular RCRA provisions or regulations governing access to information concerning the disposal of hazardous wastes or access to wastes sites must yield if they are inconsistent with particular requirements imposed by the AEA with respect to the handling of restricted data.[20]

We also believe that § 1006(a) would preclude a state from exercising veto power over the establishment or operation of a DOE facility, either by denying the necessary permits or by seeking an injunction in court against continued operation of the facility because of noncompliance with RCRA. Clearly, a state could not refuse to issue a RCRA permit, or request injunctive relief, based on DOE's noncompliance with an aspect of state or federal RCRA regulation that

---

[19] Pursuant to these provisions, access to restricted data is limited to individuals who have undergone background investigations, and is contingent on a determination that permitting such persons to have access will not endanger the common defense and safety. 42 U.S C. §§ 2163, 2165 We note that sensitive information that does not fall within the category of "restricted data" may nonetheless be classified as "national security information" under Executive Order 12356, and therefore required to be handled pursuant to the provisions of that Executive Order In addition, the Secretary of Energy has authority under the AEA to prescribe regulations or issue orders to prohibit the unauthorized dissemination of certain unclassified information if such dissemination "could reasonably be expected to have a significant adverse effect on the health or safety of the public or the common defense and security by significantly increasing the likelihood of (A) illegal production of nuclear weapons, or (B) theft, diversion, or sabotage of nuclear materials, equipment, or facilities." 42 U.S.C § 2168. It is possible that particular access and disclosure provisions of RCRA may conflict with such restrictions in some instances, in which case we believe the restrictions authorized by the AEA would prevail.

[20] As EPA points out, however, the possibility of conflict between the restricted data provisions of the AEA and the access and disclosure provisions of RCRA does not necessarily mean that DOE can refuse categorically to grant access to its facilities or to deny information to EPA and state officials responsible for enforcing RCRA. It may well be that not all information about hazardous waste disposal at DOE's facilities would require special protection, or would fall within the definition of restricted data, or within the scope of "national security information" required to be classified by Executive Order 12356. In addition, it would probably be feasible in many cases to require those officials to obtain appropriate security clearances in order to gain access to data necessary to determine compliance with RCRA regulations.

We also do not rule out entirely the possibility that some information about the production of nuclear weapons and materials at DOE's facilities is so sensitive that access must be restricted to DOE personnel, or to DOE and EPA personnel. This level of detail should be identified and worked out by DOE in cooperation with EPA. We note that EPA is working with other federal agencies, including the Department of Defense, to ensure that implementation of the RCRA program does not compromise sensitive information or the national security, and has worked with DOE to accommodate national security concerns under the FWPCA.

is inconsistent with the requirements of the AEA, within the meaning of § 1006(a). For example, we do not believe a state could refuse to issue a permit based on DOE's proper refusal under the "restricted data" provisions of the AEA to grant the state access to particular restricted data or to make such data publicly available.

In addition, even if a state could establish that DOE had not fully complied with RCRA regulations and standards not superseded by virtue of § 1006(a), *i.e.,* those that are consistent with the AEA, we have serious reservations whether a state could effectively shut down DOE's operation by denying a permit or by obtaining an injunction to enforce compliance, particularly where alternative, less drastic means of enforcement exist. While the AEA does not in so many words require DOE to operate its Atomic Energy Act facilities, the clear purpose of the statute is to authorize and encourage operation of such facilities, and the authority provided represents a congressional judgment that such activities should be carried out at a federal level. We believe therefore that it may well be "inconsistent with" the AEA itself to permit a state to veto operation of a federal facility authorized under the Act.[21] *See generally Weinberger* v. *Romero-Barcelo,* 456 U.S. 305, 315 n.9 (1982); *California* v. *United States,* 438 U.S. 645, 668 n.21, 679 (1978); *First Iowa Hydro Electric Cooperative* v. *Federal Power Comm'n,* 328 U.S. 152, 181–82 (1946); *Oklahoma* v. *Guy F. Atkinson Co.,* 313 U.S. 508, 534–35 (1941). A state could, nonetheless, include in a permit certain compliance schedules or other conditions intended to bring DOE's facilities into compliance with RCRA standards or requirements that lie within the scope of § 1006(a), and could seek judicial enforcement of those conditions through means short of an injunction against continued operation. *See, e.g., Weinberger* v. *Romero-Barcelo,* 456 U.S. 305, 315 n.9 (1982).[22] DOE would of course have the opportunity to seek review of

---

[21] We do not believe, however, that any state regulation under RCRA of DOE's Atomic Energy Act facilities would necessarily be precluded as "inconsistent." RCRA clearly provides for a significant state role in the promulgation and enforcement of standards for the treatment and disposal of solid waste, even with respect to federal facilities. *See* 42 U.S.C. § 6961. Although we believe that serious questions would be raised if a state attempted to close a DOE facility for failure to comply with state permitting or substantive requirements, much state regulation could probably be accommodated consistent with DOE's statutory mandate. We understand that DOE and EPA have worked together and with the states to implement the standards and permitting requirements set forth in the FWPCA, and we know of no persuasive reason why cooperation with state authorities with respect to hazardous waste disposal under RCRA would not also be possible.

[22] Even though the state might not be able to enforce the permit (or denial of a permit) by an injunction against continued operation of a facility, the permit itself, and the permitting process, would not be meaningless. A state (or private citizen) could, for example, seek declaratory relief that DOE should comply with particular RCRA requirements or standards embodied in a state permit or required as a prerequisite for obtaining the permit. In addition, under Executive Order 12088, there would be an opportunity for internal Executive Branch resolution of particular disputes. Executive Order 12088 requires the head of each Executive agency to insure that the agency complies with the "same substantive, procedural, and other requirements that would apply to a private person" under a number of environmental statutes, including RCRA, and to cooperate with EPA and state, interstate, and local agencies in the prevention, control, and abatement of environmental pollution. The order directs that conflicts between the EPA and an Executive Branch agency, or between an Executive Branch agency and a state, interstate, or local agency, regarding violations of those environmental statutes be resolved by the Office of Management and Budget, if such conflicts cannot be resolved through efforts of the EPA.

18

such conditions to determine that they are reasonably related to bona fide health and safety objectives and not designed to force closure of the facility.

DOE argues that the AEA does not provide for any state role in regulation of federal facilities, citing in particular the 1965 amendments to § 271 of the Act, 42 U.S.C. § 2018, that clarified Congress' intent that the states could not regulate "any activities of the [Atomic Energy] Commission." We agree with DOE that, prior to enactment of RCRA, federal facilities operated pursuant to the AEA were immune from state regulation of waste disposal practices, because of the lack of any clear waiver of sovereign immunity in the AEA or any other statute that would allow such regulation. The effect of the 1965 amendments to § 271 of the AEA, however, is largely irrelevant to our analysis here. Those amendments were intended explicitly to clarify an ambiguity in the extent to which the AEA waived sovereign immunity over regulation of the transmission and generation of electricity by federal facilities. The legislative history recited by DOE in support of its argument reflects that this was Congress' particular concern; that history reflects further that Congress intended to make clear that the federal facilities at issue stood on the same footing as all other federal agencies. *See, e.g.,* 111 Cong. Rec. 18702 (1965) (remarks of Rep. Hosmer); *id.* at 19821 (remarks of Sen. Pastore).

At that time, however, no federal facilities were subject to state regulation of hazardous waste disposal practices. Therefore, our analysis here must focus on the effect of the subsequent waiver of sovereign immunity in § 6001 of RCRA and the exception to that waiver carved out by § 1006(a) of that statute. In that regard, we believe that the waiver of sovereign immunity in § 6001 is sufficiently "clear and unambiguous," *see Hancock* v. *Train,* 426 U.S. 167, 179 (1976), to overcome the general principle that federal facilities and activities are immune from regulation by the states. Although § 1006(a) creates some ambiguity with respect to application of that waiver to "activit[ies] . . . subject to . . . the [AEA]," we do not believe that ambiguity undercuts the clarity or effectiveness of the waiver contained in § 6001.[23]

Thus, we concur with EPA's conclusion that the thrust of § 1006(a) of RCRA is not to exempt completely DOE's Atomic Energy Act facilities from

---

[23] We note that the issue whether states could regulate waste disposal practices of *federal* facilities under the AEA prior to RCRA is different from the issue whether states could then regulate waste disposal by *privately owned* facilities licensed under the AEA. The first issue is one of sovereign immunity — whether Congress has clearly and explicitly authorized the states to regulate the federal government in a particular aspect of its activities. The second issue is one of preemption — whether Congress has, in the exercise of its constitutional authority, preempted state regulation of private activities. Thus, even prior to RCRA, the states could regulate disposal of nonnuclear wastes by private licensees, because the AEA did not preempt such regulation. *See, e.g., Pacific Gas and Electric Co.* v. *State Energy Resources Conservation & Development Comm'n,* 461 U.S. 190 (1983); *Train* v. *Colorado Public Interest Research Group, Inc.,* 426 U.S. 1, 16–17 & n.14 (1976); *Illinois* v. *Kerr-McGee Corp.,* 677 F.2d 571, 580 (7th Cir. 1982); *Northern States Power Co.* v. *State of Minnesota,* 447 F.2d 1143, 1149–50 (8th Cir. 1971), *aff'd,* 405 U.S. 1035 (1972); 42 U.S.C. § 2021(k) ("[n]othing in this section authorizing limited state agreements for regulation of nuclear material shall be construed to affect the authority of any State or local agency to regulate activities for purposes other than protection against radiation hazards"). Because neither the AEA nor any other statute prior to RCRA clearly waived sovereign immunity, however, states could not then similarly regulate hazardous waste disposal practices of federal facilities.

state and federal regulation of hazardous waste disposal, but rather to avoid inconsistencies between RCRA and the unique national security and health problems created by operation of nuclear facilities under the AEA. To the extent that operation of those facilities is comparable to operation of other manufacturing and industrial facilities, Congress intended that they be subject to the standards and requirements imposed by RCRA on all other federal government facilities, and enforced by EPA and the states. To the extent there are actual inconsistencies, however, the AEA would control; this feature of the statutory scheme should be responsive to DOE's particular and clearly legitimate concerns about the protection of sensitive information and the possibility of state vetoes over operation of its facilities, while also meeting EPA's concern that RCRA regulations apply, to the extent possible, uniformly throughout the federal government.[24]

DOE argues in addition, however, that its regulations and directives under § 161(i)(3) of the AEA governing the disposal of nonnuclear wastes also constitute "requirements" of the AEA, considered in the context of the purpose and scope of DOE's authority under the AEA. DOE contends that this authority "necessarily and essentially pertains" to accomplishment by DOE of the purposes of the AEA, and is "an essential ingredient of the scheme of the [AEA]." Under this analysis, DOE's regulations or directives governing disposal of nonnuclear wastes would control, at least to the extent they are inconsistent with state or federal regulations and requirements under RCRA. The logical result of this argument is that DOE could totally exempt its Atomic Energy Act facilities from RCRA regulation by prescribing regulations or directives that differ somewhat from otherwise applicable RCRA regulations and standards.

We believe that this argument stretches the language and purpose of § 161(i)(3) beyond that intended by Congress when it enacted the AEA.[25] It is highly

---

[24] If DOE's specific concern cannot be met adequately under this scheme, it may obtain a Presidential waiver for particular facilities, or for all its Atomic Energy Act facilities, pursuant to § 6001, 42 U.S.C. § 6961.

[25] We do not suggest that, in the absence of RCRA, DOE could not use the authority provided by § 161(i)(3) to regulate the disposal of nonnuclear wastes at its Atomic Energy Act facilities. Certainly the language of that provision, giving DOE the authority "to prescribe . . standards and restrictions governing the design, location, and operation of facilities used in the conduct of such activity, in order to protect health and to minimize danger to life or property," 42 U.S.C. § 2201(i)(3), is broad enough to encompass such regulation. The grant of discretionary authority under that section to prescribe such regulations, however, does not compel the conclusion that such regulations would be requirements of the AEA.

Section 161(i)(3) was given a very narrow interpretation in *Reynolds* v. *United States,* 286 F.2d 433, 438 (9th Cir. 1960), a case involving criminal prosecution of an individual for trespass in a 390,000 square mile area surrounding the Eniwetok Proving Grounds (used for nuclear bomb testing), which had been designated as a closed area by the Atomic Energy Commission on the basis of authority provided in § 161(i)(3). Based on its reading of the legislative history of § 161(i)(3), the court concluded that the authority provided by that section applies only to activities of *private industry* licensed by the AEC, and not "to the Commission's own activities." 286 F.2d at 438–39. We believe the court's reading of that legislative history was strained in reaching the result that an individual could not be subject to serious criminal penalties for violating a regulation that arguably exceeded the Commission's authority. The logic of the court's reading of § 161(i)(3) is that the Atomic Energy Commission — and now DOE — would have no authority whatsoever to take actions to protect the health and safety of its workers or of the public from nonnuclear hazards created by its own activities. We do not believe Congress intended that result.

unlikely that Congress even considered possible problems caused by the disposal of nonnuclear wastes when it enacted the AEA in 1954. Indeed, the dimensions of the nation's hazardous waste problem were not generally acknowledged until more than a decade after enactment of the AEA. *See generally* Senate Report, *supra*, at 6; H.R. Rep. No. 899, 89th Cong., 1st Sess. 7–9 (1965) (discussing Solid Waste Disposal Act of 1965, Pub. L. No. 89–272, 79 Stat. 992). Rather, the focus of the AEA, inasmuch as it deals with disposal problems, is with regulation of nuclear wastes generated by atomic facilities. *See Pacific Gas and Electric Co. v. State Energy Resources Conservation & Development Comm'n,* 461 U.S. 190 (1983); *Train v. Colorado Public Interest Research Group, Inc.,* 426 U.S. 1, 16–17 & n.14 (1976); *Northern States Power Co. v. Minnesota,* 447 F.2d 1143, 1149–50 (8th Cir. 1971), *aff'd,* 405 U.S. 1035 (1972). There is no suggestion in the AEA or its legislative history that § 161(i)(3) was intended to require DOE to establish a comprehensive regime for the control of nonnuclear wastes, or that Congress considered such authority to be necessary to accomplishment of the purposes of the AEA. That section is, rather, most reasonably interpreted as a general grant of discretionary authority to DOE to make whatever incidental regulations it deems necessary to insure that its facilities are operated safely and with minimal risk to health, life, and property. *See generally Bramer v. United States,* 412 F. Supp. 569, 575, 577 (C.D. Cal.), *aff'd,* 595 F.2d 1141 (9th Cir. 1976) (interpreting 42 U.S.C. § 2051); *Blaber v. United States,* 332 F.2d 629, 631 (2d Cir. 1964) (interpreting 42 U.S.C. § 2051).

By contrast, RCRA is clearly and explicitly intended to provide a comprehensive scheme for regulation of the disposal of nonnuclear wastes by private entities and by the federal government. *See* Senate Report, *supra*, at 2–7; House Report, *supra*, at 2–5. In light of the clear intent and the comprehensiveness of RCRA, we are unwilling to interpret § 1006(a) to mean that, merely by exercising its discretionary authority under the AEA with respect to nonnuclear wastes, DOE can exempt itself from RCRA's regulatory scheme.

We recognize nonetheless that there may be particular operational needs or problems generated by the unique requirements of DOE's nuclear operations that in some cases will require some modification in, or exemption from, particular substantive standards imposed by the EPA or the states pursuant to RCRA. For example, it may be that inclusion of small amounts of nuclear wastes in a chemical waste stream would require some modification in otherwise applicable RCRA standards or regulations,[26] or that certain aspects of industrial processes that are unique to the fabrication of nuclear weapons materials and components require different handling of solid wastes generated

---

[26] The inclusion of small amounts of nuclear materials in such streams would not necessarily prohibit EPA from regulating those streams merely because RCRA does not apply to certain types of nuclear materials. That such wastes are commingled with nonnuclear wastes suggests that in many cases the amount of nuclear waste would not be large enough to require special handling, and therefore there would be no reason for exclusive DOE control over its handling. We believe these types of problems could be addressed by EPA and DOE in their discussions to implement this opinion.

by those processes.[27] Those situations will have to be identified and handled by DOE and EPA on a cooperative basis, in accordance with the interpretation of § 1006(a) we have outlined here.

## Conclusion

Implementation of this opinion will require DOE and EPA to discuss in detail the impact of RCRA regulations on operation of DOE's Atomic Energy Act facilities, and to determine how best to accommodate the purposes of the AEA with the specific requirements of RCRA. We recognize that the advice given here is general, and may not resolve many of the particular questions that will arise in the course of those discussions. We note, however, that EPA has conducted similar discussions with DOE in order to implement provisions of the FWPCA, and has engaged in such discussions with other federal agencies, including the Department of Defense, to implement the requirements of RCRA and the FWPCA. We suggest that those discussions might provide a framework for addressing the applicability of RCRA to DOE's Atomic Energy Act facilities. We will, of course, be available to provide additional legal analysis, should that prove necessary.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[27] The internal DOE order prescribing hazardous waste management practices, *see* DOE Order 5480.2 (Dec. 13, 1982), appears to contemplate this type of problem. Under that order, full compliance with the prescribed procedures (most of which are consistent with RCRA) may be excused "due to unique characteristics of the sites and/or facilities . . . or due to unrealistically high costs compared to the risks involved." If full compliance cannot be achieved because of high costs, "alternative methods of handling waste that will provide comparable levels of safety and environmental protection at reduced costs" must be taken.

Although we do not suggest that every situation that might warrant relaxation of DOE's internal order would constitute an inconsistency for purposes of § 1006(a), those types of situations could possibly provide a basis for noncompliance with particular RCRA requirements, if the particular characteristics or high costs involved arise because of the unique nature of the nuclear processing operations.

22